[No. B009405. Second Dist., Div. Two. Dec. 23, 1986.]

LONG BEACH SAVINGS AND LOAN ASSOCIATION,
Plaintiff and Appellant, v.
LONG BEACH REDEVELOPMENT AGENCY, et al.,
Defendants and Respondents;
INTERNATIONAL PLAZA ASSOCIATES,
Real Party in Interest and Respondent.

## COUNSEL

Sullivan, Workman & Dee, Roger M. Sullivan, Henry K. Workman and Joseph S. Dzida for Plaintiff and Appellant.

John C. Calhoun, City Attorney, Arthur Y. Honda and Barry A. Ross, Deputy City Attorneys, McDonough, Holland & Allen and Richard E. Brandt, for Defendants and Respondents.

Greenberg, Glusker, Fields, Claman & Machtinger and Garrett L. Hanken for Real Party in Interest and Respondent.

## OPINION

**COMPTON, J.**—This is an appeal by Long Beach Savings and Loan Association (Association) after the trial court denied its petition for administrative mandamus and other relief against respondents City of Long Beach (City) and its redevelopment agency (Agency).[1] These proceedings followed the execution of a disposition and development agreement between Agency and International Plaza Associates (Developer) for the construction in City's downtown area of an office, retail and entertainment complex to be known as International Plaza.[2] We affirm.

Association, the lessee of a building which will be demolished to make room for the development,[3] sought a writ of mandate ordering respondents to prepare and certify a site specific environmental impact report (EIR)[4] for the project.

The record reveals that by the 1960's, City's downtown area was in a state of physical, social and economic deterioration. In 1970, City commissioned the consulting firm of Gruen Associates to prepare a general redevelopment plan for its civic center.[5] The Gruen plan, which encompassed 421 acres, proposed that a new business core comprised of high-rise buildings be

---

[1]Association sought a writ of administrative mandate, a writ of ordinary mandate, and injunctive and declaratory relief.

[2]When built, International Plaza will consist of two towers, one fourteen stories high and the other five stories, a three-level parking structure with one thousand seventy five parking spaces, an atrium, an ice rink, and three floors devoted to retail use, with the balance of space set aside for business offices. The edifices will encompass approximately 433,665 square feet. Totaled, redevelopment will account for approximately 2.4 million square feet of new construction.

[3]Association has approximately 13 years remaining on its lease. In 1980, it spent $250,000 to renovate and remodel its building. Association also sought unsuccessfully to bid for the development contract.

[4]As discussed in more detail, *post,* under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) and its administrative guidelines (Guidelines) (Cal. Admin. Code, tit. 14, § 15000 et seq.), an EIR is an informational document whose purpose is to facilitate public debate on the merits of certain projects which may have a significant effect on the environment. (Pub. Resources Code, § 21061; Cal. Admin. Code, tit. 14, § 15121.) In the instant case, defendants are alleged to have improperly used a document known as a mitigated negative declaration to circumvent the EIR requirement. When a project is found not to have significant environmental impacts or if its potential adverse effects can be mitigated to a point of insignificance, CEQA permits government agencies to issue a negative declaration stating the same.

[5]Legislative bodies and community redevelopment agencies by law are authorized to eliminate blighted areas within their jurisdiction. (Community Redevelopment Law [Health & Saf. Code, § 33000 et seq.].) This is accomplished through the state's eminent domain power to condemn private property. (Health & Saf. Code, § 33037.) They are further empowered either to use public funds to make improvements or they can enter into agreements with private land developers who then repurchase the property and improve it according to the government entity's specifications. (Health & Saf. Code, § 33430.)

developed at key locations along Ocean Boulevard and at a pedestrian mall located on Locas Avenue. In 1975, the Gruen plan was the subject of an EIR, which, pursuant to the Community Redevelopment Law, was submitted to Agency and its legislative body, the Long Beach City Council (City Council), for certification.[6]

As redevelopment progressed and a more detailed design plan was formulated, respondents constructed a public transit exchange on property adjacent to Association's building. Agency then decided that the placement of a multipurpose complex next to the exchange was desirable because 16 of City's 18 bus lines departed from and terminated at that facility. A major goal of redevelopment has been to encourage pedestrian travel between downtown locations and the use of public transportation.

The record further reveals that respondents' environmental review process occurred as follows. On November 4, 1981, after Agency determined that Developer's bid was acceptable, it applied to City's Planning Division for an initial study of International Plaza's possible impacts on its surroundings. Based on the preliminary design plans of the project, a negative declaration was prepared, released for public comment and scheduled for discussion at a public hearing of the Planning Commission (Commission) to be held on January 7, 1982. The negative declaration recognized that if certain mitigation measures were not followed, the project would have a significant impact on the environment. The purpose of the hearing was to review the document and recommend whether it should be forwarded to Agency.

At the proceeding, a legal representative of Association appeared and lodged with the Commission a seven-page letter addressing the various impacts of the project and requesting the preparation of an EIR. The Commission, nevertheless, voted to recommend that the Agency adopt the negative declaration and to consider the concerns expressed in Association's letter.

Thereafter, on February 10, 1982, the negative declaration was revised. This revision contained 24 mitigation measures, such as "(#4) Applicant shall encourage employees to utilize public transportation . . . (#7) The

---

[6]A redevelopment plan must be accompanied with "the report required by Section 21151 of the Public Resources Code." (Health & Saf. Code, § 33352, subd. (i).) Public Resources Code section 21151 in 1975 provided in relevant part: "All local agencies shall prepare, or cause to be prepared by contract, and certify the completion of an environmental impact report on any project they intend to carry out or approve which may have a significant effect on the environment."

project shall fully conform to the 'Design Guidelines for Downtown Long Beach',. . . (#8). . . Applicant shall provide vehicular access from Long Beach Boulevard. (#13) Exterior decorative lighting shall be 'low voltage' or low pressure sodium lighting, and (#17) The project shall conform to the Parking Standards of the Zoning Ordinance."

On April 26, 1982, Agency approved a resolution that requested the City Council to call a joint public hearing with it to review the negative declaration. The hearing was thereafter calendared for June 1, 1982. Association received both a notice of the hearing and a copy of the proposed negative declaration. On May 26, 1982, the Committee received a second letter from Association accompanied with additional analysis prepared by an environmental consultant and a traffic engineer. The letter was then circulated among the Planning Division's staff who determined that the communication contained no new information and that the preparation of a full EIR was not warranted. At the joint hearing on June 1, 1982, the governmental bodies, by resolution, approved both the negative declaration and the development agreement between Developer and Agency.

Following the full course of administrative proceedings, Association filed its petition for writ of mandamus attacking the adoption of the negative declaration on both procedural and substantive grounds. After conducting an extensive hearing and reviewing the voluminous documents submitted by the parties, the trial court denied the relief requested.

In its memorandum of decision, the court stated in pertinent part: ". . . [A] separate environmental impact report (EIR) is not required; the General Plan antecedent is adequate and, even if it were not, Health & Safety Code § 33500 bars petitioner's attack on its adequacy; the Disposition and Development Agreement is valid and was properly approved; a new EIR is not required; and expenditures of public funds in connection with the project are not illegal by reason of any of the contentions advanced by petitioners. The court concludes that the only change of circumstances or new development that might have such an adverse effect as to require a new or separate EIR is traffic and traffic-related factors in connection with the project. These are so mitigated that it cannot be fairly argued that, with the mitigating factors, such adverse effect might occur. [¶] The petition has been reviewed both under Pub. Res. Code § 21168 (as a matter of administration [*sic*] mandamus; C.C.P. § 1094.5; see *Horn* v. *County of Ventura* (1979) 24 C.3d 605, 612) and under Pub. Res. Code § 21168.5 (see C.C.P. § 1085). Whichever provision is applied, the result is the same in this case."

Before proceeding to a discussion of the various issues raised by this appeal, we briefly examine the purpose and rationale of the environmental review process under CEQA.

CEQA was enacted to preserve and enhance the natural environment of this state by establishing procedures to "[e]nsure that the long-term protection of the environment, consistent with the provision of a decent home and suitable living environment for every Californian, shall be the guiding criterion in public decisions." (Pub. Resources Code, § 21001, subd. (d).) Recognizing the finite limitation on the capacity of the environment, the Legislature directed governmental decision makers to "take immediate steps to identify any critical thresholds for the health and safety of the people of the state and take all coordinated actions necessary to prevent such thresholds being reached." (Pub. Resources Code, § 21000, subd. (d).) Thus, as framed by the Legislature, the express policy of this state is to: "(a) Develop and maintain a high-quality environment now and in the future, and take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state. (b) Take all action necessary to provide the people of this state with clean air and water, enjoyment of aesthetic, natural, scenic, and historic environmental qualities, and freedom from excessive noise." (Pub. Resources Code, § 21001, subds. (a) & (b).)

As has been noted elsewhere, "[a] very similar concern for the health, safety, and general welfare of the people is embodied in the Community Redevelopment Law. (Health & Saf. Code, § 33000 et seq.) The Legislature identified the existence of blighted areas within many communities 'which constitute either social or economic liabilities, or both, requiring redevelopment in the interest of the health, safety, and general welfare of the people of such communities and of the State.' (Health & Saf. Code, § 33030.) Redevelopment complements CEQA; both aim at improvement of the environmental quality of life. Therefore, a redevelopment agency must comply with CEQA in adopting and implementing a redevelopment plan. (Health & Saf. Code, § 33352, subd. (i).)" (*Dusek* v. *Redevelopment Agency* (1985) 173 Cal.App.3d 1029, 1036 [219 Cal.Rptr. 346].)

CEQA and the CEQA Guidelines,[7] promulgated by the State Resources Agency to implement the Act, establish a three-tiered environmental review process which local agencies must follow. If a proposed project falls within a category exempt from the requirement of CEQA by administrative regula-

---

[7]References to the "Guidelines" throughout this opinion are to CEQA Guidelines contained in the California Administrative Code, title 14, section 15000 et seq., which are binding on all public agencies.

tion, or if it is certain that the project will not have a significant effect upon the environment, no further agency evaluation is required. If there is a possibility that the project may have a significant environmental effect,[8] the agency must conduct an initial threshold study. (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66].) There are two possible results of such a study. "If the agency determines that there is substantial evidence that any aspect of the project, either individually or cumulatively, may cause a significant effect on the environment . . .," it must prepare an EIR, although it can use an existing EIR if one has been prepared which adequately analyzes the project at hand. (Cal. Admin. Code, tit. 14, § 15063, subd. (b)(1)(A), (B).) "If a lead agency[9] determines that a proposed project, not otherwise exempt from the provisions of [the California Environmental Quality Act], does not have a significant effect on the environment, the lead agency shall adopt a negative declaration to that effect. . . ." (Pub. Resources Code, § 21080, subd. (c); see also Cal. Admin. Code, tit. 14, §§ 15063(b)(2), 15070(a).) A negative declaration is "a written statement briefly describing the reasons that a proposed project will not have a significant effect on the environment and does not require the preparation of an environmental impact report." (Pub. Resources Code, § 21064.)

When the preparation of an EIR is warranted, the document must identify, inter alia, the "significant environmental effects" of the proposed project, point out those effects which can be avoided or mitigated to a level of insignificance, describe mitigation measures which could minimize significant adverse impacts, and suggest and evaluate alternatives to the proposed action. (Cal. Admin. Code, tit. 14, § 15126.) In general terms, the EIR process provides for extensive research and information gathering, consultation with other state and local agencies and with persons or organizations directly concerned, public review and comment, evaluation and response to comments, and detailed findings. (Pub. Resources Code, §§ 21080.3, 21080.4, 21153, 21082.1.)

On the other hand, a negative declaration must include: "(a) A brief description of the project, including a commonly used name for the project, if any; (b) The location of the project, preferably shown on a map, and the

---

[8]The term "significant environmental effects" is defined as "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance." (Cal. Admin. Code, tit. 14, § 15382.)

[9]" 'Lead agency' means the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment." (Pub. Resources Code, § 21067.)

name of the project proponent; (c) A proposed finding that the project will not have a significant effect on the environment; (d) An attached copy of the initial study documenting reasons to support the finding; and (e) Mitigation measures, if any, included in the project to avoid potentially significant effects." (Cal. Admin. Code, tit. 14, § 15071.)

The issuance of an unfavorable environmental impact report does not necessarily foreclose the development of a particular project. Although the Legislature has explicitly declared "that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects," it also has made it clear that if remedial measures are not feasible because of specific economic, social, or other conditions, "individual projects may be approved in spite of one or more significant effects thereof." (Pub. Resources Code, § 21002; see also Pub. Resources Code, § 21002.1, subd. (c).) Guideline 15093, subdivision (a) similarly provides that "CEQA requires the decisionmaker to balance the benefits of a proposed project against its unavoidable environmental risks in determining whether to approve the project. If the benefits of a proposal project outweigh the unavoidable adverse environmental effects, the adverse environmental effects may be considered 'acceptable.' "

At this juncture, we think it important to emphasize that the task of the judiciary is not to question the wisdom of proceeding with a project. Our purpose in reviewing environmental decisions is not to pass upon the correctness of a public entity's conclusions, but only upon the sufficiency of an EIR or negative declaration as an informative document. (See *Las Virgenes Homeowners Federation, Inc.* v. *County of Los Angeles* (1986) 177 Cal.App.3d 300, 305 [223 Cal.Rptr. 18]; *Santiago County Water Dist.* v. *County of Orange* (1981) 118 Cal.App.3d 818, 823 [173 Cal.Rptr. 602].) In so doing, we look to see whether policymakers have been adequately informed of the consequences of their decisions, and whether the public has sufficient information to evaluate the performance of their elected officials. (See *People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 842 [115 Cal.Rptr. 67].) As a result, we must be satisfied that the particular governmental agency involved has fully complied with the procedural requirements of CEQA, because only in this way "can a subversion of the important public purpose of CEQA be avoided. . . ." (*Ibid.*)

Judicial review of administrative decisions under CEQA is governed by sections 21168 and 21168.5 of the Public Resources Code.[10] Under these

---

[10]Section 21168 provides: "Any action or proceeding to attack, review, set aside, void or

sections the questions for the court are: "(1) whether there is any substantial evidence in light of the whole record to support the decision; and (2) whether the agency making the decision abused its discretion by failing to proceed in the manner required by law." (*Dehne* v. *County of Santa Clara* (1981) 115 Cal.App.3d 827, 835 [171 Cal.Rptr. 753].)[11]

■ Our role here is precisely the same as that of the trial court. " '[I]n an administrative mandamus action where no limited trial de novo is authorized by law, the trial and appellate courts occupy in essence identical positions with regard to the administrative record, exercising the appellate function of determining whether the record is free from legal error. [Citations.]' (*Honey Springs Homeowners Assn.* v. *Board of Supervisors* (1984) 157 Cal.App.3d 1122, 1135, fn. 10 [203 Cal.Rptr. 886].) Thus, the conclusions of the superior court, and its disposition of the issues in this case, are not conclusive on appeal. (*Lewin* v. *St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 387 [146 Cal.Rptr. 892].)" (*Orinda Assn.* v. *Board of Supervisors* (1986) 182 Cal.App.3d 1145, 1160 [227 Cal.Rptr. 688].)

With these principles in mind, we now turn to the issues posed by the instant appeal.

Although Association's attack upon the judgment is couched in a variety of terms, it essentially contends that the negative declaration was insufficient and that a full EIR should have been prepared. ■ In so arguing, Association first maintains that respondents failed to proceed in a manner required by law when Agency and City, before circulating the negative declaration for public review, did nothing to insure that alleged significant

---

annul a determination, finding or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency, on the grounds of noncompliance with the provisions of this division shall be in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure. [¶] In any such action, the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in the light of the whole record."

Section 21168.5 provides: "In an action or proceeding, other than an action or proceeding under Section 21168, to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."

[11]For purposes of this appeal there appears to be no material distinction between sections 21168 and 21168.5. As previously noted, the trial court reviewed Agency's actions under both statutes and concluded that "[w]hichever provision is applied, the result is the same in this case." Under the circumstances, we find it unnecessary to determine which section controls.

impacts on the environment would be mitigated either through revisions in the project plan or enforceable commitments by the Developer. It further asserts that two mitigation measures, intended to relieve parking and traffic problems, were not made binding on the Developer and were not circulated for public review.

■■■ ■ During the review period in question,[12] Guideline 15033 defined a negative declaration as "a written statement by the Lead Agency briefly describing the reasons that a proposed project, although not otherwise exempt, will not have a significant effect on the environment and therefore does not require the preparation of an EIR." (Cal. Admin. Code, tit. 14, § 15033; Cal. Admin. Register 80, No. 19B; repealed 1983 Cal. Admin. Register 83, No. 29B; now found in substantially the same language at § 15371.) Respondents were also required to give notice that a proposed negative declaration was under consideration and then keep the document under review "long enough to provide members of the public with sufficient time to respond to the proposed finding before the Negative Declaration is approved." (Cal. Admin. Code, tit. 14, § 15083(d) and (c)(3); Cal. Admin. Register 80, No. 19B; repealed in 1983 Cal. Admin. Register 83, No. 29B; now found in substantially the same language at § 15073.)

We are unpersuaded by Association's argument that respondents were required to either first revise the project or obtain binding commitments from the Developer to implement the mitigation measures before the negative declaration was promulgated for public review. In making its assertion, Association relies on former Guideline 15080(d) in effect *beginning February 1982.* That section, in pertinent part, provided that a mitigated negative declaration may be prepared where the mitigation measures "shall be limited to changes in the project resulting from either: 1. Revisions in the project plans made by the applicant or 2. An enforceable commitment from the applicant to include the mitigation measures in the project." (Cal.

---

[12]Since the original adoption of the redevelopment project, and during the period of respondents' environmental review process of International Plaza, CEQA Guidelines have gone through extensive revisions. Fairness and the need for finality thus requires that the propriety of respondents' actions be measured against those regulations in effect as of November 1981, the date when respondents presented the negative declaration for public review. Indeed, this rule of reason was eventually recognized by the drafters of the CEQA Guidelines. Although not in existence until 1983, present day Guideline 15007, subdivisions (b) and (c) provides: "(b) Amendments to the guidelines apply prospectively only. New requirements in amendments will apply to steps in the CEQA process not yet undertaken by the date when agencies must comply with the amendments. (c) If a document meets the content requirements in effect when the document *is set out for public review,* the document shall not need to be revised to conform to any new content requirements in guideline amendments taking effect before the document is finally approved." (Italics added.)

Admin. Code, tit. 14, § 15080(d)(A)(1)(2); Cal. Admin. Register 82, No. 2.) However, the controlling guideline at the time the negative declaration in question was released for public review reads as follows: "Where a project is revised in response to an Initial Study so that potential adverse effects are mitigated to a point where no significant environmental effects would occur, a Negative Declaration shall be prepared instead of an EIR. If the project would still result in one or more significant effects on the environment after mitigation measures are added to the project, an EIR shall be prepared." (Cal. Admin. Code, tit. 14, § 15080(d)(2); Cal. Admin. Register 80, No. 19B.) Therefore, it is manifest that under the relevant Guidelines, neither project revisions nor enforceable commitments were a statutory prerequisite to the issuance of a mitigated negative declaration. Moreover, even assuming, as Association asserts, that the aforementioned requirements were mandatory under then existing case authority, its argument would, nonetheless, be moot. Section 302 of the development agreement explicitly requires the Developer to comply with the mitigation measures set forth in the negative declaration. (See fn. 13, *post.*)

We next turn to the question of whether prejudicial procedural error occurred when two mitigation measures were added to the negative declaration without recirculation of the document for public review and comment.

In response to Association's comments to the negative declaration, Committee added two mitigation measures to the negative declaration and presented them to the Agency and the Commission at their joint hearing on June 1, 1982. These measures, however, were made public only when they were released to Association's counsel during a recess at the proceeding. The additional measures stated as follows:

"In view of the variable and complexity of the project and in the uncertainty in projections and discounts for joint usage, use of public transportation, 'walk-in' trade, and the 'sympathetic' use of other parking the lead agency *recognizes the commentor's concerns and adopts the following policy and mitigation measures:* [¶] 25. The minimium parking requirements of the adoptive Long Beach zoning ordinance shall be adhered to without variance. Since the adoption of the ordinance, the parking requirements have been found to mitigate otherwise unmet parking demands by new projects. [¶] 26. If it is demonstrated in the project operations, that joint usage is not functioning and the parking demands are not reasonably met as determined by the Long Beach City Planning Commission, then the applicant shall stagger the hours of operation, secure additional parking, or appropriately alter the Land Use Mix. The above shall be reviewed and acted upon by the

Long Beach City Planning Commission at a full Public Hearing. This mitigation measure shall be included as a condition of Site Plan Review." (Italics added.)

We find nothing in CEQA commanding respondents to circulate for public review *additional* mitigation measures made in *response* to comments by those who oppose the project. To allow the public review period to proceed *ad nauseam* would only serve to arm persons dead set against a project with a paralyzing weapon—hired experts who can always "discover" flaws in mitigation measures. █ As previously noted, the purpose of CEQA is to inform government decision makers and their constituency of the consequences of a given project, not to derail it in a sea of administrative hearings and paperwork. The instant case is not an example where government officials misled the public by circulating a negative declaration based on certain mitigation measures and then withdrew the measures.[13] Nor is there a showing that the additional measures amounted to a fundamental reorganization of the negative declaration requiring subsequent public input (see, e.g., *Sutter Sensible Planning, Inc. v. Board of Supervisors* (1981) 122 Cal.App.3d 813 [176 Cal.Rptr. 342]).

 In response to Association's argument that the negative declaration permits respondents to confront future changes in the project in an ad hoc basis, we hasten to point out that CEQA does not require an analysis of every imaginable alternative or mitigation measure; its concern is with feasible means of reducing environmental effects. Section 21002 states in part that the intention of CEQA is to "assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects."

"Feasible" is defined as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic,

---

[13]Association contends that since the contract binds Developer to adhere to the November 12, 1981, negative declaration, which was subsequently revised, the additional measures are of no legal effect. Assuming arguendo this is correct, the Developer will still be bound to the added measures. Developer is required under other terms of the agreement to follow City's zoning ordinances regarding parking requirements. Further, the contract calls for Developer to secure all necessary local government permits and comply with all other local laws and regulations. For a project the size of International Plaza, City's zoning law requires a site plan review. At that time, if necessary, site plan approval can be withheld until Developer reaffirms its commitment to the measure requiring the staggering of tenant's operational hours. Moreover, because site plan review is a discretionary act under CEQA (see § 21080), respondents concede that they "could not approve the site plans (without the preparation of a new EIR) if the developer did not accept or agree to whatever measures might be needed to eliminate significant effects."

environmental, social, and technological factors." (Pub. Resources Code, § 21061.1.) ■ "The statute does not demand what is not realistically possible, given the limitation of time, energy and funds." (*Foundation for San Francisco's Architectural Heritage* v. *City and County of San Francisco* (1980) 106 Cal.App.3d 893, 910 [165 Cal.Rptr. 401].) Instead, the requirement that an environmental review document identify alternative and mitigation measures "must be judged against a rule of reason. There is no need for . . . [such a document] to consider an alternative whose effect cannot be reasonably ascertained and whose implementation is deemed remote and speculative [citation]." (*Ibid.;* see also *Residents Ad Hoc Stadium Com.* v. *Board of Trustees* (1979) 89 Cal.App.3d 274, 286-287 [152 Cal.Rptr. 585].)

■ Although it may be reasonably argued that the negative declaration could have been more comprehensive, its failure to contemplate every imagined possibility does not render the document insufficient as a matter of law. "Absolute perfection is not required; what is required is the production of information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned. It is only required that the officials and agencies make an objective, good-faith effort to comply." (*Foundation for San Francisco's Architectural Heritage* v. *City and County of San Francisco, supra,* 106 Cal.App.3d 893, 910; see also *Mount Sutro Defense Committee* v. *Regents of University of California* (1978) 77 Cal.App.3d 20, 37 [143 Cal.Rptr. 365].) We think it clear that respondents acted in good faith throughout the review process, and that the negative declaration was as complete and comprehensive as possible.

■ Having concluded that respondents' environmental review process proceeded in a manner required by law, we next address Association's contention that the adoption of a negative declaration constituted an abuse of discretion because a "fair argument" exists that International Plaza may have a significant impact on its surroundings. This argument is premised on that portion of *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 83-85, which holds that an EIR must be prepared whenever it can be fairly argued on the basis of substantial evidence that a project may have a significant environmental impact, and that if there is substantial evidence of such impact, evidence to the contrary is not sufficient to support a decision to dispense with the preparation of an EIR. (See also Guideline section 15064(g)(1); *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 1002 [165 Cal.Rptr. 514].)

■ We find, however, that the "fair argument" test, which would be controlling had respondents never prepared an EIR in the first instance, is

inapplicable here. That test evolved out of cases where an agency did not initially certify an EIR pursuant to section 21151,[14] but rather attempted to avoid an EIR altogether by utilization of a negative declaration. Whereas section 21151 requires an EIR if the project "may have a significant effect on the environment," section 21166[15] provides that an agency may not require preparation of another EIR unless "substantial changes" in the project or its circumstances will require "major revisions" to the EIR. These two statutes serve different purposes and have correspondingly different effects. The question addressed by section 21151 is whether any environmental review is warranted. CEQA procedures reflect a preference for resolving doubts in favor of such review. (Guidelines §§ 15063, 15064, subd. (h).) In our case, however, section 21166 applies because in-depth review already has occurred, the time for challenging the sufficiency of the original EIR has long since expired (§ 21167, subd. (c)), and the question is whether circumstances have changed enough to justify repeating a substantial portion of the process.[16]

Moreover, redevelopment projects receive special status under the law. "For all purposes of [CEQA] all public and private activities or undertakings

---

[14]Section 21151 provides: "All local agenices shall prepare, or cause to be prepared by contract, and certify the completion of an environmental impact report on any project they intend to carry out or approve which may have a significant effect on the environment. When a report is required by Section 65402 of the Government Code, the environmental impact report may be submitted as a part of that report. [¶] For purposes of this section, any significant effect on the environment shall be limited to substantial, or potentially substantial, adverse changes in physical conditions which exist within the area as defined in Section 21060.5."

[15]Section 21166 reads as follows: "When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."

[16]Former Guideline 15067, in effect in November 1981, outlined under what conditions the preparation of a subsequent EIR was required. In summary, it provided that where a negative declaration would suffice and, no additional EIR would be necessary unless (1) subsequent changes were proposed in the project which would create new significant environmental impacts not previously considered; (2) substantial changes occurred with respect to the circumstances under which the project was undertaken which would have resulted in previously unconsidered significant environmental impacts; and (3) new information of substantial importance showing that the project will have significant effects not previously discussed had become available and this "information was not known and could not have been known at the time. . . the Negative Declaration was adopted." (Cal. Admin. Code, tit. 14, § 15067; Cal. Admin. Register 80, No.19B; repealed in 1983 Cal. Admin. Register 83, No. 29B; now found in substantially the same language at Cal. Admin. Code, tit. 14, § 15162.)

pursuant to or in furtherance of a redevelopment plan shall be deemed a single project." (Pub. Resources Code, § 21090.) This rule is presently restated in a guideline which provides that "An EIR on a redevelopment plan shall be treated as a program EIR with no subsequent EIRs required for individual components of the redevelopment plan unless a subsequent EIR . . . would be required by Section 15162. . . ." (Cal. Admin. Code, tit. 14, § 15180(b).)

Based upon the foregoing, we can only conclude that in cases such as this, where a redevelopment EIR already has been certified and a negative declaration has been prepared in lieu of a subsequent supplemental or site specific EIR, the test is whether the record as a whole contains substantial evidence to support the agency's determination that a particular project will not have a significant adverse effect on the environment. The court's observation in *Running Fence Corp.* v. *Superior Court* (1975) 51 Cal.App.3d 400, 424 [124 Cal.Rptr. 339] is particularly applicable here. "We reject the inference that the existence of factual controversy, uncertainty, conflicting assertions, argument, or public controversy can of themselves nullify the adoption of a negative declaration and require the preparation of an EIR when there is no substantial evidence in the record that the project as designed and approved will fall within the requirements of [CEQA]." (Fn. omitted.)

 Having carefully reviewed the record, we find that in the specific areas cited by Association, i.e., parking, traffic, and air quality, the evidence is more than sufficient to establish that International Plaza will only have an insignificant impact on the environment and that any changes brought about by the project were not so "substantial" as to require preparation of an additional EIR.

The chief source of the impact predicted by Association is the number of vehicle trips the project will introduce into the vicinity. For example, Association asserts that the capacity of the project's parking structure is inadequate and, thus, will create traffic congestion as visitors and workers vie for limited street parking. There is, however, credible evidence in the record that Association's concerns are unfounded. As redevelopment progressed, parking increased since office buildings with parking facilities replaced retail establishments whose patrons were required to park on the street. Furthermore, the City's experts opined that the mix of office, shopping, restaurant, and entertainment facilities in International Plaza lessens traffic because drivers in a single trip could accomplish multiple tasks. The experts also concluded that, should the occasion call for it, staggered operational hours by the buildings' tenants would alleviate overcrowding of the project's

parking facility. If the more detailed architectural plans of the complex prove the mitigation measures to be inadequate, building permits would be withheld until appropriate revisions were made in the development. Transportation studies, which were incorporated into the negative declaration by reference, established that the City's street system had the capacity to handle increases in motor vehicle traffic caused by the complex. Moreover, studies, which anticipated the development of a project substantially the same size and nature of International Plaza, revealed no adverse impact on the environment's air quality. Lastly, the City's experts concluded that by locating the project adjacent to the transit exchange workers and visitors would readily use public transportation.

Based upon our examination of the record as a whole, we must conclude that, as a matter of law, the project as mitigated will not have a significant impact on the environment and that no additional EIR was warranted.

At this juncture, we think it important to note that since the initial redevelopment EIR in 1975, respondents have prepared and certified nine other EIRs for projects in the downtown area. The impacts identified by Association have previously been raised, made public, and studied by respondents. In fact, between the time of trial and this appeal, a tenth EIR, although not site specific, has been completed which considered, among other projects, the various impacts of International Plaza. In the final analysis, we are thoroughly convinced that respondents and the citizenry of the City of Long Beach had before them meaningful information to make informed decisions concerning the redevelopment of their civic center.

The judgment is affirmed.

Roth, P. J., and Gates, J., concurred.

A petition for a rehearing was denied January 16, 1987, and appellant's petition for review by the Supreme Court was denied March 11, 1987.