[No. D017570. Fourth Dist., Div. One. Oct. 14, 1993.]

SIERRA CLUB et al., Appellants, v.
CALIFORNIA COASTAL COMMISSION, Respondent;
CITY OF CARLSBAD et al., Real Parties in Interest.

COUNSEL

Laurens H. Silver for Appellants.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Jan S. Stevens, Assistant Attorney General, and Jamee Jordan Patterson, Deputy Attorney General, for Respondent.

Ron Ball, City Attorney (Carlsbad), James K. Hahn, City Attorney (Los Angeles), Winston F. Tyler and Raymond P. Bender, Assistant City Attorneys, D. Dwight Worden, W. Scott Williams and Michael S. Haberkorn for Real Parties in Interest.

OPINION

BENKE, J.—In this case we are confronted with the conflicting interests of fish and fowl at Batiquitos Lagoon. We find the California Coastal Act gives the Coastal Commission the power to resolve this conflict and that the commission acted properly in doing so.

FACTUAL AND PROCEDURAL HISTORY

1. *Batiquitos Lagoon*

The factual setting which gives rise to this appeal was summarized in the record by the California Coastal Conservancy (Conservancy):[1] "Batiquitos Lagoon is one of a series of six lagoons on the northern coast of San Diego County. It lies at the southern edge of the City of Carlsbad, extending inland for two and one-half miles from its ocean mouth and averaging one-half mile in width. As a coastal wetland, the lagoon provides wildlife habitat for many resident and migratory species as well as an open space and recreational area for its human neighbors.

"Less than 150 years ago Batiquitos Lagoon was a fully tidal system, nourished by daily infusions of ocean water. Archaeological evidence shows the lagoon held marine shellfish which the local Indians harvested in abundance. The lagoon has changed significantly since this time with the advent of European and American settlement. Roads and railroads now crisscross the lagoon restricting water flows; vast amounts of sediment, washed down from plowed and graded watershed, has filled in the lagoon. Portions of the original eastern lagoon have been filled; waterflows from the upper watershed have been caught behind a dam and diverted to other uses. All these alterations, perceived and carried forth as isolated actions, combine to drastically alter the lagoon. Batiquitos Lagoon is now filled with water only seasonally, when tributary streams flow; tidal inflows have largely stopped.

"The changes which have occurred at Batiquitos Lagoon are exemplary of the problems associated with many coastal wetlands in this region. Filling for urban use, port and harbor development and sedimentation have replaced marshes, lagoons and estuaries along much of the California coast. Southern California has experienced the highest rate of loss with over 75% of its coastal wetlands gone. Los Angeles/Orange counties have experienced a 90% reduction of coastal wetland acreage. This nearly complete destruction of wetland habitats in southern California has made those areas which do remain extremely valuable.

"Despite all the changes Batiquitos Lagoon has undergone, large numbers of migratory birds stop here every year on their annual journey. The lagoon

---

[1] The California Coastal Conservancy was created by the Legislature for the purpose of protecting coastal lands from intrusion of nonagricultural uses. (Pub. Resources Code, § 31050 et seq.) In creating the Conservancy the Legislature found ". . . important fish and wildlife habitat, natural areas, and scenic and environmental resources within the coastal zone have been degraded due to indiscriminate dredging, filling, and the intrusion of incompatible land uses." (Pub. Resources Code, § 31053.)

contains many acres of salt and brackish marsh and is a home for several endangered species. While diminished in its capacity as a tidal system, the lagoon is a rare and valuable habitat worth preserving and enhancing. Without some human intervention to benefit the lagoon environment, it will continue to degrade and eventually lose many of its wetland values."

In light of conditions at the lagoon, in 1985 the Conservancy developed a Batiquitos Lagoon Enhancement Plan. The Conservancy plan considered four alternative restoration schemes. The Conservancy concluded a key component of any successful restoration was keeping the mouth of the lagoon open and thereby restoring tidal exchange.

### 2. Port of Los Angeles

In 1987 the California Coastal Commission (Commission) approved a permit for dredging in the Port of Los Angeles (POLA). The dredging was part of a proposed "Pactex" pipeline in the port. In order to mitigate impacts of the proposed dredging, the Commission required that POLA engage in off-site mitigation. POLA determined it would carry out the mitigation by paying for a portion of the proposed restoration of Batiquitos Lagoon. The lagoon project would meet POLA's mitigation needs because returning fish life to the lagoon would restore the same type of habitat the Pactex project was found to threaten.

POLA entered into a memorandum of understanding (MOU) with the City of Carlsbad (Carlsbad), the United States Fish and Wildlife Service, the California Lands Commission and the National Marine Fisheries Service. The MOU required POLA to contribute $15 million to the restoration and required the other agencies to provide the balance of funding and obtain the appropriate approvals for the project.[2]

### 3. Selection of Mitigated Alternative B

Acting as the "lead agency" for the restoration project, Carlsbad prepared a draft environmental impact report/impact statement (EIR). The EIR took the Conservancy's four preliminary alternatives and labeled them Alternatives A through D. In addition, the EIR evaluated as Alternative E a variation of Alternative D and also evaluated the "No Project" Alternative.

These alternatives were then further refined through an extensive public input process conducted by Carlsbad. As a result, the final environmental

---

[2]The Pactex project was eventually abandoned, but POLA continued its participation in the lagoon restoration.

impact report (FEIR) prepared by Carlsbad proposed additional mitigation measures and modifications to create three modified alternatives which were labeled "Mitigated Alternatives A-C." One final alternative was evaluated, Alternative F, in response to comment letters received during the review period.

Ultimately, the FEIR evaluated 10 different alternative restoration plans. Five of the alternatives evaluated would develop fully tidal systems of varying degrees and through various techniques, three would develop intermittent tidal systems and two alternatives would not develop tidal systems at all. The FEIR found that only the alternatives which provided full tidal flushing would successfully restore the lagoon.

Based upon an analysis of all 10 alternatives contained in the FEIR, and measuring each against environmental standards and criteria, the FEIR selected Mitigated Alternatives A, B and C as the most feasible and environmentally sensitive alternatives. In analyzing these three alternatives, the FEIR concluded that Mitigated A and B would have short-term impacts during the project construction but no significant adverse long-term impacts. Mitigated C was found to have the same short-term impacts as Mitigated A and B but that Mitigated C would, in addition, have a significant long-term adverse impact since it would create only an intermittent tidal system with a greater potential for lagoon closure.

In the end the FEIR prepared by Carlsbad recommended Mitigated Alternative B over Mitigated Alternative A. However, in applying to the Commission for a coastal permit, Carlsbad asked for approval of Mitigated Alternative A. The chief difference between Mitigated Alternative A and Mitigated Alternative B is that Mitigated Alternative A results in 120 acres of intertidal habitat which is needed for propagation of waterfowl, while Mitigated Alternative B results in 144 acres of such habitat.

In reviewing Carlsbad's application, the Commission's staff recommended approval of Mitigated Alternative B. However, the Commission approved the application for Mitigated Alternative A.

After the Sierra Club and the Buena Vista Audubon Society initiated the instant proceedings, Carlsbad amended its application to seek a permit for Mitigated Alternative B. The application as amended was approved by the Commission.[3]

In approving Mitigated Alternative B, the Commission made findings which in pertinent part state: "It must also be acknowledged that the

---

[3]The Commission made no determination about POLA's right to use its participation as mitigation of future projects.

proposed restoration of the lagoon does not simply result in enhancement of existing resources. Rather, the proposed creation of marine tidal habitat will be accomplished by the loss of existing shallow subtidal open water area and non-tidal flats that currently provide habitat value for avian populations that inhabit the lagoon. While this habitat is variable and unreliable, given the currently blocked lagoon mouth, some habitat values are found in the lagoon that will be altered by the project.

". . . . . . . . . . . . . . . . . . . . . . . . . .

". . . . One example of the types of impacts habitat conversion will cause involves that class of ducks known as 'dabblers.' Any of the so-called tidal alternatives will result in reduced area of ponded shallow water during the winter and spring. This will result in a reduction in the type of habitat currently being utilized for feeding by dabbling duck species. The lagoon would, therefore, not support as many dabbling ducks at any one time as compared to existing conditions."

### 4. *Trial Court Proceedings*

Following the Commission's approval of Mitigated Alternative A, the Sierra Club and the Buena Vista Audubon Society (collectively Sierra Club) filed a petition under Code of Civil Procedure section 1094.5 in the trial court, alleging the Commission acted unlawfully in approving Carlsbad's application.

After Carlsbad amended its application and the amended application was approved by the Commission, Sierra Club amended its petition to allege approval of Mitigated Alternative B was unlawful. Following preparation of the administrative record, the parties submitted written briefs to the trial court. Among other issues, Sierra Club argued the Commission failed to properly explain why it rejected nontidal alternatives which would not have as substantial an impact on existing bird habitat at the lagoon.

The trial court denied the petition and Sierra Club filed a timely notice of appeal.

### ISSUES ON APPEAL

As it did below, on appeal the Sierra Club argues the Commission did not properly explain how it selected Mitigated Alternative B and that, in any

event, the project is barred by Public Resources Code[4] section 30233, subdivision (b), because the project will significantly disrupt marine and wildlife habitats and water circulation.

DISCUSSION

I

*Governing Law*

A. *Substantive Law*

The substantive law governing this case is set forth primarily in section 30233, which is part of the California Coastal Act (Act) (§ 30000 et seq.). In pertinent part section 30233 states: "(a) The diking, filling, or dredging of open coastal waters, wetlands, estuaries, and lakes shall be permitted in accordance with other applicable provisions of this division, where there is no feasible less environmentally damaging alternative, and where feasible mitigation measures have been provided to minimize adverse environmental effects, and shall be limited to the following:

". . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(7) Restoration purposes.

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(b) Dredging and spoils disposal shall be planned and carried out to avoid significant disruption to marine and wildlife habitats and water circulation. Dredge spoils suitable for beach replenishment should be transported for such purposes to appropriate beaches or into suitable longshore current systems."[5]

Section 30108 provides that as used in the Act: " 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of

---

[4]Unless otherwise indicated, all statutory references are to the Public Resources Code.

[5]Section 30233, subdivision (c), states: "In addition to the other provisions of this section, diking, filling, or dredging in existing estuaries and wetlands shall maintain or enhance the functional capacity of the wetland or estuary. Any alteration of coastal wetlands identified by the Department of Fish and Game, including, but not limited to, the 19 coastal wetlands identified in its report entitled, 'Acquisition Priorities for the Coastal Wetlands of California', shall be limited to very minor incidental public facilities, restorative measures, nature study, commercial fishing facilities in Bodega Bay, and development in already developed parts of south San Diego Bay, if otherwise in accordance with this division.

"For the purposes of this section, 'commercial fishing facilities in Bodega Bay' means that not less than 80 percent of all boating facilities proposed to be developed or improved, where

time, taking into account economic, environmental, social, and technological factors."

## B. *Standards of Review*

 Because this matter came to the trial court on a petition for a writ of mandate under Code of Civil Procedure section 1094.5, the trial court was obligated to determine "both whether substantial evidence supports the administrative agency's findings and *whether the findings support the agency's decision.*" (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514-515 [113 Cal.Rptr. 836, 522 P.2d 12], italics added (*Topanga*).)

"[T]he agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order. . . . By focusing . . . upon the relationships between evidence and findings and between findings and ultimate action, the Legislature sought to direct the reviewing court's attention to the analytic route the administrative agency traveled from evidence to action. In so doing, we believe that the Legislature must have contemplated that the agency would reveal this route." (*Topanga, supra,* 11 Cal.3d at p. 515.)

While a reviewing court must make certain an agency has adequately disclosed its reasoning process, "*Topanga* reiterates the long established rule in California that administrative findings need not be as precise or formal as would be required of a court [citation]. Indeed, the Supreme Court there considered a planning commission's summary of 'factual data' to be agency findings [citation]. . . . Other examples of the judiciary's willingness to focus on the substance rather than the form of administrative actions are legion. 'As a practical matter, omissions in [administrative] findings may sometimes be filled by such relevant references as are available.' [Citation.] Thus, where reference to the administrative record informs the parties and reviewing courts of the theory upon which an agency has arrived at its ultimate finding and decision it has long been recognized that the decision should be upheld if the agency 'in truth found those facts which as a matter of law are essential to sustain its . . . [decision].' [Citations.]" (*McMillan* v. *American Gen. Fin. Corp.* (1976) 60 Cal.App.3d 175, 183-184 [131 Cal.Rptr. 462], fns. omitted.)

---

such improvement would create additional berths in Bodega Bay, shall be designed and used for commercialfishing activities."

Batiquitos Lagoon is one of the 19 coastal wetlands identified by the Department of Fish and Game in its report. Sierra Club does not directly dispute that mitigated alternatives is a "restorative measure" within the meaning of section 30233, subdivision (c). Rather, Sierra Club argues that other less intrusive restorative measures should have been selected.

In determining whether substantial evidence supports an agency's reasoning process, the trial court must look at the "whole record." (Code Civ. Proc., § 1094.5, subd. (b); *Sierra Club* v. *California Coastal Com.* (1993) 12 Cal.App.4th 602, 610 [15 Cal.Rptr.2d 779].) "The 'in light of the whole record' language means that the court reviewing the agency's decision cannot just isolate the evidence supporting the findings and call it a day, thereby disregarding other relevant evidence in the record. [Citation.] Rather, the court must consider all relevant evidence, including evidence detracting from the decision, a task which involves some weighing to fairly estimate the worth of the evidence. [Citation.]' [Citations.] That limited weighing is not an independent review where the court substitutes its own findings or inferences for the agency's. [Citation.] 'It is for the agency to weigh the preponderance of conflicting evidence [citation]. Courts may reverse an agency's decision only if, *based on the evidence before the agency*, a reasonable person could not reach the conclusion reached by the agency.' [Citation.]" (*Ibid.*, fn. omitted.)

Finally, "[o]ur role here is precisely the same as that of the trial court. ' "[I]n an administrative mandamus action where no limited trial de novo is authorized by law, the trial and appellate courts occupy in essence identical positions with regard to the administrative record, exercising the appellate function of determining whether the record is free from legal error. [Citations.]" [Citation.] Thus, the conclusions of the superior court, and its disposition of the issues in this case, are not conclusive on appeal. [Citation.]' [Citation.]" (*Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency* (1986) 188 Cal.App.3d 249, 260 [232 Cal.Rptr. 772].)

With these principles in mind we turn the issues raised on appeal.

II

*No Feasible Alternatives*

As we have noted under section 30233, subdivision (a), the Commission was required to find that, other than Mitigated Plan B, there was "no feasible less environmentally damaging alternative." Sierra Club's principal contention on appeal is that the Commission's findings do not adequately explain how, in selecting Mitigated Alternative B, the Commission rejected nontidal alternatives which would preserve more waterfowl habitat. We reject Sierra Club's criticism of the Commission's findings.

Our review of the record discloses that the FEIR adopted by Carlsbad determined:

(1) that in the absence of some restoration of tidal action in the lagoon, "the lagoon would continue to fill with upland sediments and eventually be converted to an upland habitat type. . . . The further sedimentation of the lagoon and conversion to an upland habitat type would result in the eventual loss of a coastal resource that cannot be replaced";

(2) that any restoration plan for the lagoon which will be successful over the long term requires full tidal flushing;

(3) that of the ten alternatives reviewed, only five alternatives would provide sufficient tidal prism or exchange to accomplish full tidal flushing; and

(4) that of those five, Mitigated Alternative B is the least environmentally damaging.

More importantly, the record discloses that these findings in the FEIR were part of the administrative record referenced by the Commission in making its findings. Because the findings in the FEIR fully explain the rationale which led the Commission to determine there is no feasible less environmentally damaging alternative, these findings meet the requirements of Code of Civil Procedure section 1094.5. (*McMillan* v. *American Gen. Fin. Corp.*, *supra*, 60 Cal.App.3d at pp. 184-185.)

Moreover our review of the "whole record" discloses these findings are supported by substantial evidence. The threat to the lagoon if no action is taken is set forth in the statements of the Conservancy: "Sedimentation levels into the lagoon far exceed natural levels and the lagoon is quickly filling in. Now that the mouth rarely opens except in large floods, nearly all the sediment entering the lagoon remains there, progressively building up the bottom elevations and transforming the lagoon into an upland." "While diminished in its capacity as a tidal system, the lagoon is a rare and valuable habitat worth preserving and enhancing. Without some human intervention to benefit the lagoon environment, it will continue to degrade and eventually lose many of its wetland values."

In accepting the need for a large tidal prism as the means of restoring the lagoon, as opposed to mechanical devices which would be employed in the nontidal alternatives, the Commission could again rely on the Conservancy's finding that "[t]he single most important hydrologic design constraint for Batiquitos Lagoon is to ensure that there is sufficiently large tidal prism to keep the entrance channel open." While the Commission no doubt had the authority to accept the expert evidence offered in support of the nontidal alternatives, upon reviewing the whole record we cannot say the Commission acted unreasonably in accepting the conclusion of other experts, and in

particular the Conservancy, that full tidal flushing by way of a large tidal prism was needed.

The Commission's determination that, of the alternatives which would provide sufficient tidal prism, Mitigated Alternative B was the least environmentally damaging is also amply supported in the record. Alternatives A, B, C and Mitigated Alternatives A and·B were the only alternatives which would keep the channel open. Alternatives A, B and C would cause significantly greater disturbance to existing habitat than the mitigated alternatives and Mitigated Alternative A would result in less waterfowl habitat than Mitigated Alternative B. Mitigated Alternative C, on the other hand, would have about the same environmental impact as Mitigated Alternative B, but it would not produce sufficient tidal prism and hence would create a higher risk that tidal flushing would be interrupted.

We note that the Sierra Club also suggests that a phased construction program, rather than the relatively short intense dredging schedule contemplated by Mitigated Alternative B, would be preferable. However, the FEIR rejected this alternative because it would result in prolonged impacts to the lagoon. Under a phased dredging program developing habitat in one portion of the lagoon would be destroyed when, three to five years later, silt from other portions of the project was deposited on it. Thus we are in no position to find the Commission acted unreasonably in rejecting a phased dredging schedule.

## III

### *Mitigation Measures*

Although not directly attacked by Sierra Club, we note that as required by section 30233, subdivision (a), the Commission also considered whether "feasible mitigation measures have been provided to minimize adverse environmental effects." In its findings the Commission described the five mitigation measures incorporated into the plan prior to approval of the FEIR by Carlsbad: "First, the limits of the proposed dredge zone were withdrawn from areas populated with coastal salt marsh vegetation to the greatest degree feasible. The impacts to coastal salt marsh species were reduced from 67 acres of displaced salt marsh vegetation to a total of seven acres of displaced vegetation. The remaining displaced vegetation will occur in isolated islands of marsh plants in the western basin of the lagoon.

"Second, the dredging plan has been modified to establish a gently sloping lagoon bottom. The sloping bottom has been proposed to duplicate the

physical characteristics of intertidal zones similar to those found in other Southern California lagoons.

"Third, rather than a straight channel as originally proposed, the mitigation measures call for a meandering channel. The meandering channel allows for the more gently sloping tidal areas to be located on both the north and south sides of the lagoon. As originally proposed, the tidal areas would have been located north of the channel.

"Fourth, the California least tern nesting areas were located and modified. The relocations allow easier access for management personnel while providing greater isolation from adjacent land uses.

"Fifth, the proposed freshwater pond was eliminated. This eliminates displacement of existing habitat areas for the construction of the pond."

In addition to identifying these mitigation measures, the Commission imposed a number of conditions of its own. In pertinent part the Commission required that the applicant:

1. Obtain a revegetation plan prepared by a qualified wetland biologist, which at a minimum would provide for the storage and preservation of coastal salt marsh plant material disturbed during construction of the project and for the transplantation of eel grass and cord grass throughout the lagoon.

2. Submit a monitoring plan which, upon completion of the project would measure the slopes along side the lagoon, tides in the lagoon, the extent, rate of growth and species composition of all enhanced or restored areas. The monitoring plan would require annual monitoring reports for the first three years after completion and at the fifth and tenth years following completion.

3. Restrict the staging areas for the dredging operation to two approved sites.

4. Submit a plan to protect California least tern nesting sites from predators during construction of the project.

5. As a means of protecting Belding's Savannah sparrow nesting, halt construction activities within 100 feet of any areas containing salt marsh vegetation during the period of March 15 to August 15 and limit variations of water levels during the same period.

The Commission's recitation of these mitigation measures amply explains the reasoning it employed in concluding, as required by section 30233,

subdivision (a), that feasible mitigation measures have been provided to minimize adverse environmental effects.

## IV

### Section 30233, Subdivision (b)

■ Next, Sierra Club argues that in light of the 2.2 to 3.1 million cubic feet of dredging in the lagoon required by the project, Mitigated Alternative B is barred by the requirement of section 30233, subdivision (b), that dredging "shall be planned and carried out to avoid significant disruption to marine and wildlife habitats and water circulation." As Sierra Club reads section 30233, subdivision (b), the Commission has no power to approve dredging projects which will significantly disrupt any habitat or water circulation. We disagree with Sierra Club's interpretation of the statute.

In interpreting section 30233, subdivision (b), we begin by recognizing that "[w]ords used in a statute or constitutional provision should be given the meaning they bear in ordinary use. [Citations.] If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) or of the voters (in the case of a provision adopted by the voters). [Citations.]

"But the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.] Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act. [Citations.] An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in the light of the statutory scheme [citation]; and if a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed [citation]. These rules apply as well to the interpretation of constitutional provisions. [Citation.]" (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

These rules of statutory construction have some bearing here because Sierra Club argues that in requiring dredging "avoid" significant disruption, the statute literally prohibits dredging whenever a significant impact will

occur. Because the word "avoid" connotes some measure of flexibility in responding to a particular risk,[6] we do not accept the premise that the plain meaning of the statute requires the strict and unyielding construction advanced by Sierra Club. However, in finding the Commission has the power in particular cases to permit significant short-term disruption in order to provide long-term benefits, we need not rely solely on a linguistic analysis of section 30233, subdivision (b).

As we have seen, section 30233, subdivision (b), cannot be considered in isolation. Rather we must interpret it in light of other provisions of the Act (*Lungren* v. *Deukmejian, supra,* 45 Cal.3d at p. 735), in particular, sections 30007.5 and 30230. Section 30007.5 states: "The Legislature further finds and recognizes that conflicts may occur between one or more policies of the division. The Legislature therefore declares that in carrying out the provisions of this division such conflicts be resolved in a manner which on balance is the most protective of significant coastal resources. In this context, the Legislature declares that broader policies which, for example, serve to concentrate development in close proximity to urban and employment centers may be more protective, overall, than specific wildlife habitat and other similar resource policies." Section 30230 in turn states: "Marine resources shall be maintained, enhanced, and, where feasible, restored. Special protection shall be given to areas and species of special biological or economic significance. Uses of the marine environment shall be carried out in a manner that will sustain the biological productivity of coastal waters and that will maintain healthy populations of all species of marine organisms adequate for long-term commercial, recreational, scientific, and educational purposes."

In our view the policy of restoring tidal flushing at the lagoon and thereby restoring and maintaining historic marine habitat is supported by section 30230. To the extent this policy conflicts with the restriction on dredging set forth in section 30233, subdivision (b), the plain meaning of section 30007.5 authorized the Commission to resolve the conflict in favor of long-term protection of the lagoon. Thus section 30233, subdivision (b), did not prevent approval of Mitigated Alternative B.

## CONCLUSION

Having reviewed the whole record, we conclude the Commission's approval of Mitigated Alternative B meets the requirements of the Act

---

[6]According to the Random House Dictionary (2d ed. 1987) pages 143-144, avoid means "1. to keep away from; keep clear of; shun; *to avoid a person*; *to avoid taxes*; *to avoid danger*. 2. to prevent from happening: *to avoid falling*."

and in particular, section 30233. Although, like the Commission, we recognize the project will impose environmental costs, both reason and the Act itself give the Commission the power to measure those costs against the risk of doing nothing and the alternative risk of approving a project which has only a small chance of success.

Judgment affirmed. Respondent is awarded its costs of appeal.

Kremer, P. J., and Froehlich, J., concurred.

Appellants' petition for review by the Supreme Court was denied January 27, 1994.