[No. B190122. Second Dist., Div. Six. May 8, 2008.]

CHARLES A. PRATT CONSTRUCTION CO., INC., Plaintiff and Appellant, v.
CALIFORNIA COASTAL COMMISSION, Defendant and Respondent.

COUNSEL

Manatt, Phelps & Phillips, Michael M. Berger; and William S. Walter for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, J. Matthew Rodriquez, Assistant Attorney General, and John A. Saurenman, Deputy Attorney General, for Defendant and Respondent.

**OPINION**

**GILBERT, P. J.**—If "it's a long, long time from May to December,"[1] it's an eternity from 1973 to 2008. But time, as Einstein taught us, is relative.

From a developer's perspective, time stops when rights vest. Government Code section 66498.1 confers a vested right to proceed with a development that complies with local ordinances in effect when a local agency approves a vesting tentative map. But if a development does not comply with state and federal laws, the march of time is inexorable notwithstanding section 66498.1. This illustrates yet another perspective about time: "Nothing endures but change." (Heraclitus, a Greek philosopher, 540–475 B.C.)

Charles A. Pratt Construction Co., Inc. (Pratt), filed this petition for a writ of administrative mandate, ordinary mandate and for damages against the California Coastal Commission (Commission). Pratt sought an order requiring the Commission to set aside its decision denying it a coastal development permit under the California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq. (Coastal Act)),[2] and for damages arising from a regulatory taking of its property. The trial court denied Pratt's petition for writ of administrative or ordinary mandate, and dismissed its taking claim as not ripe. We affirm.

FACTS

*The History*

The issues in this appeal involve a vesting tentative subdivision map in 1990. Earlier events set the issues in context.

In May of 1973, San Luis Obispo County (County) approved Pratt's tentative subdivision map designated as tract 308, units I and II. "Unit I" was a 25-acre parcel which could be divided into 86 residential lots. "Unit II" was an 81-acre parcel which could be divided into 149 residential lots.

The County's approval was in concept only. It was subject to a number of conditions, such as approval of a grading plan and an erosion control plan. Over the course of five years, the County gave Pratt extensions of time to meet the conditions.

---

[1] See and listen to "September Song"—music by Kurt Weill; lyrics by Maxwell Anderson.

[2] All statutory references are to the Public Resources Code unless otherwise stated.

Eventually, Pratt filed a claim with the South Central Coast Regional Commission (Regional Commission)[3] seeking a determination that it had a vested right to subdivide Unit I into 86 lots and to complete offsite improvements. Pratt did not make a claim of a vested right for Unit II. The Regional Commission denied Pratt's claim to a vested right for a final map for Unit I. But the Regional Commission found Pratt did have a vested right to complete offsite improvements because of the substantial investment Pratt had made for those improvements.

Pratt petitioned the superior court for a writ of mandate to vacate the Regional Commission's denial of the final map for Unit I. The superior court granted Pratt relief, and the Regional Commission appealed. The Court of Appeal held that approval of the tentative map did not give Pratt a vested right because Pratt had not satisfied the conditions necessary to fulfill the requirements of the map. (*South Central Coast Regional Com. v. Charles A. Pratt Construction Co.* (1982) 128 Cal.App.3d 830, 846 [180 Cal.Rptr. 555].) Nevertheless, the court held that because Pratt was allowed to complete the offsite improvements, the Commission must grant a permit to complete the subdivision so long as the subdivision comports with the land density requirements of the Coastal Act. (128 Cal.App.3d at p. 848.) Again, the court considered only the 25 acres of Unit I. (*Id.* at p. 835.)

In 1985, Pratt submitted a new vesting tentative map to the County as tract 1342. The new map contemplated subdivision of the 25 acres of Unit I into 40 lots with a remainder parcel of 81 acres, Unit II. A remainder parcel is one that is not proposed for development and is not counted as part of the subdivision. (Gov. Code, § 66424.6.) The County and the Commission approved the application. A final map was recorded in 1989.

*The Project*

In February of 1990, for the first time, Pratt applied for a new vesting tentative map, tract 1873, that encompassed the 81 acres of Unit II, plus an additional 40 acres for open space. The new map proposed 41 residential lots. The County approved tract 1873 on September 1, 1999.

A number of parties, including governmental agencies, appealed the County's approval to the Commission. The Commission found the appeal presented substantial issues and set the matter for a de novo hearing. (§ 30625, subd. (b).)

At the hearing, Pratt claimed that Unit II was exempt from the Coastal Act. Pratt's claim of exemption was based on the theory that it had a vested right

---

[3] The Commission has succeeded to the powers of the Regional Commission. (§ 30305.)

to complete the project or at least a vested right to complete the offsite improvements. In June of 2000, the Commission rejected Pratt's vested rights claim, and denied its application for a coastal development permit.

Pratt filed the instant action for mandamus to require the Commission to vacate its decision denying the development permit and for damages. Pratt alleged, among other matters, that the 1990 vesting tentative map vested its rights subject only to laws and policies in existence at the time, and that the Commission's decision was based on postvesting policies. Pratt also alleged that the Commission has taken its property without compensation in that the Commission deprived it of substantially all economically viable use of its property, has defeated its reasonable investment-backed expectations, and has unreasonably delayed its right to make beneficial use of its property.

The trial court denied Pratt's petition for writ of mandate because it found Pratt had no vested rights and that the Commission's decision denying the development permit is based on substantial evidence. The trial court granted judgment on the pleadings on Pratt's taking causes of action on the ground that the actions are not ripe for adjudication.

## DISCUSSION

## I

Pratt contends the Commission lacked jurisdiction to consider the appeal.

Pratt points out that the Commission's appellate jurisdiction is limited to determining whether the permit issued by the County is consistent with the local coastal plan (LCP) and whether the permit violates coastal access policies. (§ 30603, subd. (b).) Here, because no issues were raised concerning coastal access, jurisdiction is limited to determining whether the County's permit is consistent with the LCP.

Pratt argues that its filing of the vesting tentative map in 1990 gave it the right to develop its property subject only to laws and policies existing at the time. Pratt claims, and the Commission does not dispute, that the Commission's denial of its coastal development permit is based on policies enacted after it filed his vesting tentative map.

Pratt's vested rights argument relies on Government Code section 66498.1, subdivision (b). Subdivision (b) provides in part: "When a local agency approves or conditionally approves a vesting tentative map, that approval shall confer a vested right to proceed with development in substantial compliance with the ordinances, policies, and standards described in

Section 66474.2." Subject to exceptions not relevant here, Government Code section 66474.2, subdivision (a) requires a local agency to apply only those ordinances, policies and standards in effect on the date the local agency has determined the tentative map application is complete.

The flaw in Pratt's argument is Government Code section 66498.6, subdivision (b). That subdivision provides: "The rights conferred by this chapter shall relate only to the imposition by local agencies of conditions or requirements created and imposed by local ordinances. Nothing in this chapter removes, diminishes, or affects the obligation of any subdivider to comply with the conditions and requirements of any state or federal laws, regulations, or policies and does not grant local agencies the option to disregard any state or federal laws, regulations, or policies." (*Ibid.*)

In an attempt to avoid Government Code section 66498.6, Pratt claims that once the LCP is certified by the Commission, it becomes a matter of local law. Thus, Pratt argues, the vesting provisions of Government Code section 66498.1, subdivision (b) apply.

■ Under the Coastal Act's legislative scheme, however, the LCP and the development permits issued by local agencies pursuant to the Coastal Act are not solely a matter of local law, but embody state policy. The Commission's primary responsibility is the implementation of the Coastal Act. It is designated the state coastal zone planning and management agency for any and all purposes. (§ 30330.) Local government prepares the LCP. (§ 30500, subd. (a).) But the LCP must be submitted for the Commission's approval. (§ 30512, subd. (a).) The Commission may certify the LCP only if it meets the requirements of and is in conformity with the policies of the Coastal Act. (§ 30512, subd. (c).) Zoning and other actions to implement the LCP must also be submitted to the Commission for approval. (§ 30513.) Once the Commission certifies the LCP and all implementing actions become effective, the Commission's authority over coastal development permits is "delegated to the local government . . . ." (§ 30519, subd. (a).) Finally, the Commission has appellate jurisdiction to determine whether the development permit issued by the local government is consistent with the LCP and coastal access policies. (§ 30603, subd. (b).)

■ Although local governments have the authority to issue coastal development permits, that authority is delegated by the Commission. The Commission has the ultimate authority to ensure that coastal development conforms to the policies embodied in the state's Coastal Act. In fact, a fundamental purpose of the Coastal Act is to ensure that state policies prevail over the concerns of local government. (See *City of Chula Vista v. Superior Court* (1982) 133 Cal.App.3d 472, 489 [183 Cal.Rptr. 909] [Commission

exercises independent judgment in approving LCP because it is assumed statewide interests are not always well represented at the local level].) The Commission applies state law and policies to determine whether the development permit complies with the LCP. Under Government Code section 66498.6, subdivision (b), such state laws and policies are not subject to the vesting provisions of Government Code section 66498.1, subdivision (b). The filing of Pratt's vesting tentative map did not deprive the Commission of jurisdiction.

Pratt's reliance on *Yost v. Thomas* (1984) 36 Cal.3d 561 [205 Cal.Rptr. 801, 685 P.2d 1152], is misplaced. There, after the Commission certified the LCP, the city approved a general plan amendment, a specific plan and rezoning affecting property in the coastal zone. Opponents of the city's acts sought to rescind them by referendum. The property owner claimed the city's acts were not subject to referendum because they were administrative, and only legislative acts are subject to referendum. Although the acts are ordinarily legislative, the owner argued that the requirement that the city comply with the LCP makes the city an agent of the state in enacting land use policies in the coastal zone. (*Id.* at p. 571.) Our Supreme Court rejected the argument, stating: "[The Coastal Act] leaves wide discretion to a local government not only to determine the contents of its land use plans, but to choose how to implement these plans. Under such circumstances a city is acting legislatively and its actions are subject to the normal referendum procedure." (*Id.* at p. 573.)

 *Yost* stands for nothing more than that a city's actions in implementing the LCP retain their legislative nature for the purposes of referendum. That does not mean that, once the LCP is certified, it becomes a matter of local law. The city's actions in implementing the LCP, as well as any coastal development permit issued by the city, are still subject to Commission review. (§§ 30513, 30603.) *Yost* did not involve the question at issue here. A case is not authority for issues it does not consider. (*Contra Costa Water Dist. v. Bar-C Properties* (1992) 5 Cal.App.4th 652, 660 [7 Cal.Rptr.2d 91].)

II

Pratt contends the Commission's actions were arbitrary and capricious. We must uphold the Commission's findings of fact if they are supported by substantial evidence. (*Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1282, 1288–1289 [38 Cal.Rptr.3d 316].) We reverse if no reasonable person would have reached the same conclusion. (*Id.* at p. 1289.)

### (a)

Pratt argues the Commission erred in treating the vast bulk of its property as an environmentally sensitive habitat area (ESHA). It claims the LCP designates that portion of its property as a sensitive resource area (SRA). Pratt claims that an ESHA is only one type of SRA. It points out that there are other types of SRA's, but the ESHA is the most extreme in its impact on development.

The map on which Pratt relies shows a large portion of its land designated as an SRA. But the map also shows the area designated as a "terrestrial habitat." A legend on the map lists "terrestrial habitats" as among "sensitive resource areas that are also environmentally sensitive habitats." Thus substantial evidence supports the Commission's treatment of a large portion of Pratt's parcel as an ESHA.

Pratt's reliance on *Security National Guaranty, Inc. v. California Coastal Com.* (2008) 159 Cal.App.4th 402 [71 Cal.Rptr.3d 522], is misplaced. There the court determined that the Commission has no jurisdiction on an appeal of a coastal development permit to designate a new ESHA that contradicted the terms of a certified LCP. Here the Commission did not seek to create a new ESHA designation on Pratt's land. It simply determined correctly that the LCP had designated much of Pratt's land to be an ESHA.

### (b)

Pratt argues the Commission used the County's generic provision for view protection rather than the LCP. Pratt does not specify in what way the Commission relied on the County's generic rules instead of the LCP in assessing visual impacts. Instead, Pratt cites a number of ways in which it believes it has complied with the LCP.

Pratt points out that the LCP requires clustering of homes in a way that leaves 80 percent of the property undeveloped. But that does not mean that the proposed development on the remaining 20 percent complies with all other policies of the LCP.

Pratt points out that the LCP encourages placing development in "slope created 'pockets'" to minimize visual impacts. Pratt argues the County found its project satisfies that standard. But if the Commission were bound by the County's finding that the project complies with the LCP, there would be no reason to allow an appeal to the Commission. It is simply no argument to say that the County found the project meets the LCP's view preservation requirements. The Commission recommended that development be limited to

below the 600-foot contour, as in an alternative project approved by the County's planning commission. That would be the same elevation as homes in an existing adjacent site.

Pratt claims its project will satisfy the requirement that building materials use native materials and textures. Assuming that is true, it does not mean other visual impacts meet the requirements of the LCP.

### (c)

Pratt challenges the Commission's findings on the availability of water. Pratt points out that it obtained a "can and will serve" letter from the Southern California Water Company. Pratt claims the Commission simply ignored the letter.

But it is undisputed that Pratt's project lies outside the urban services line (USL). The LCP allows development outside the USL only "if it can be serviced by adequate private on-site water and waste disposal systems." Thus a commitment by a community offsite water company, such as Southern California Water Company, is insufficient.

Pratt points out that Southern California Water Company plans to supply a private onsite manmade reservoir. The County found this sufficient to satisfy the LCP's "private on-site water" requirement. But the Legislature made the Commission, not the County, the final word on the interpretation of the LCP. (See § 30603, subd. (b).) Indeed, under the County's interpretation of the LCP, community offsite water service becomes private onsite water service simply because the water is temporarily stored in a manmade reservoir. Under the County's interpretation, the LCP's intent to give priority for community-based services to land within the USL is easily defeated. The most reasonable interpretation of the LCP's "private on-site water" requirement is that it is limited to water developed from naturally occurring sources on the project site. Pratt's project does not meet that requirement.

### (d)

Pratt argues that the Commission suffers from "legal myopia" in its determination that no development can occur on the Pratt property until after all the "infill" lots within the USL have been "built out."

The Commission concluded: "The project is inconsistent with LCP provisions that prohibit subdivisions unless there are adequate public services to accommodate the new lots, after priority uses such as agriculture and infill of existing lots within the urban area have been accommodated. Because there

are significant unresolved issues with respect to the availability of such services, particularly water and sewage treatment, the project can not be found to be consistent with these LCP requirements and therefore must be denied."

Pratt does not dispute the Commission's conclusion that the LCP mandated infill lots within the USL have priority on public services. Instead, Pratt asserts, without citation to the record, that the infill lots are under an indefinite, if not permanent, moratorium imposed by the Regional Water Quality Control Board. Assuming the infill lots are under a moratorium, Pratt cites no authority holding that the moratorium frees the Commission from enforcing the policy contained in the LCP giving priority to the infill lots.

(e)

Pratt argues there is no basis for the Commission's combined water and sewer objections. Pratt points out that the environmental impact report (EIR) for the project concludes that the water usage and replenishment for the project are essentially in balance.

The final EIR for the project states that the groundwater basin on which the project would rely is in overdraft. The final EIR also states, however, that unlike most projects, Pratt's project would actually increase recharge of the groundwater basin. The EIR quotes a comment from the County's engineering department after its review of the draft EIR: " 'In the worst-case scenario, the project would increase the overdraft by 2.5%; in the best case, the project would reduce the overdraft by less than 1% . . . .' "

In rejecting the EIR's conclusion, the Commission stated: "Based on the assumed increase in recharge that would result from the project, and the expectation that this recharge will exceed the consumptive water use of the project, the EIR concludes that the project will result in a net increase of available water resources, and no significant impacts to water resources will occur. [Fn. omitted.] [¶] The Commission can not agree with this assumption, based upon the highly speculative nature of the amount of recharge being assumed by the EIR. It appears scientifically unfounded that the proposed development, which will cover open space areas comprised of sandy soils and drought tolerant vegetation with impervious surfaces, will increase the amount of groundwater recharge that is currently occurring on the site. Appendix C of the Final EIR does not provide the data necessary to support this questionable assumption."

Pratt cites no authority that the Commission is bound by the findings in the EIR. Here the Commission simply rejected a conclusion that seems at

best highly suspect. In any event, even if the project balanced water usage and replenishment, that would not affect the LCP's policy giving priority to other uses.

Each of the Commission's reasons for denying the permit is supported by the record. Any one of them is sufficient to sustain the denial.

### III

Pratt contends that if the Commission's interpretations of the LCP are correct, there is no economically productive use that can be made of its property. Pratt concludes its taking claim is ripe for adjudication.

■ The Fifth Amendment to the United States Constitution prohibits a taking of property for public use without just compensation. The Supreme Court has articulated two circumstances that constitute a categorical taking: where the regulation allows a permanent physical invasion of the property or where the regulation deprives the owner of all economically viable use. (*Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003, 1015 [120 L.Ed.2d 798, 112 S.Ct. 2886].)

In *Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104 [57 L.Ed.2d 631, 98 S.Ct. 2646] (*Penn Central*), the Supreme Court discussed noncategorical takings. The court observed, "[T]he 'Fifth Amendment's guarantee . . . [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole . . . .' " (*Id.* at p. 123, quoting *Armstrong v. United States* (1960) 364 U.S. 40, 49 [4 L.Ed.2d 1554, 80 S.Ct. 1563].) The court stated that whether a regulation becomes a taking under this standard will rest on an ad hoc factual inquiry into the particular circumstances of the case. (*Penn Central*, at p. 124.) It is only when a regulation goes "too far" that it becomes a taking. (*Penna. Coal Co. v. Mahon* (1922) 260 U.S. 393, 415 [67 L.Ed. 322, 43 S.Ct. 158].)

■ Here the trial court dismissed Pratt's taking claim pursuant to the Commission's motion for summary adjudication on the ground that the claim is not ripe. As the Supreme Court explained in *Palazzolo v. Rhode Island* (2001) 533 U.S. 606, 618 [150 L.Ed.2d 592, 121 S.Ct. 2448], "[A] takings claim challenging the application of land-use regulations is not ripe unless 'the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.' " (Quoting *Williamson Planning Comm'n v. Hamilton Bank* (1985) 473 U.S. 172, 186 [87 L.Ed.2d 126, 105 S.Ct. 3108].) A final decision by the responsible state agency determines whether a regulation has deprived

a landowner of all economically beneficial use of his property or results in a noncategorical taking under *Penn Central.* (*Palazzolo*, at p. 618.)

Pratt claims that 80 percent of its tract is designated ESHA and that no development is possible in an ESHA. Assuming Pratt's claim is true, that leaves 20 percent of the 121-acre tract, over 24 acres, available for development.

Moreover, the Commission noted the availability of alternative lot configurations, such as one approved by the County's planning commission, as sensitive to both habitat and views. Pratt appealed the planning commission's approval to the county's board of supervisors where it was overturned. Far from showing the Commission has made a final determination as to what use, if any, will be allowed for Pratt's property, the Commission has shown its willingness to consider alternatives to Pratt's proposal.

Pratt argues the Commission decided the project cannot satisfy the water requirements for three reasons: the project has no water onsite; it is outside the USL and cannot have water brought to it; and the Commission is on record as refusing a division of one parcel into three inside the USL because there is not enough water.

The Commission stated: "As detailed above, the existing demand on water from the Los Osos Groundwater Basin appears to be exceeding the safe yield of this basin based upon the best available scientific information. Thus, there does not appear to be adequate water available to support the development of Coastal Act priority uses or existing undeveloped lots within the USL, let alone new subdivisions outside the USL. [Fn. omitted.] As a result, approval of a 41-lot subdivision outside of the USL would be clearly inconsistent with the priorities for water service established by . . . [the LCP]."

The Commission concluded only that a 41-unit subdivision would be inappropriate. It did not decide that a less intense project could not gain approval.

Moreover, Pratt cites no authority holding that the denial of a development permit because of insufficient water supply constitutes a taking. Nor does Pratt cite authority that the setting of priorities for water use in the face of an insufficient supply constitutes a taking. Even where the lack of water deprives a parcel owner of all economically beneficial use, it is the lack of water, not a regulation, that causes the harm.

That the Southern California Water Company issued a "can and will serve" letter does not change the result. Pratt cites no authority that the water company's determination is definitive. It is undisputed that there is substantial evidence from which the Commission could conclude the groundwater basin from which the water would come is in overdraft. Pratt has simply failed to demonstrate with sufficient certainty that its proposed 41-unit subdivision will have an adequate supply of water. Without such a demonstration, the extent of the development that can be allowed on its parcel cannot be determined.

Finally, it is undisputed that Pratt has no approval for a wastewater disposal plan from the Regional Water Quality Control Board. It is also undisputed that an approved plan is necessary for development. Pratt fails to explain how the extent of allowed development on its parcel can be determined without such a plan.

Pratt is not entitled to whatever project it desires. Pratt has yet to submit proposals that contemplate a reduction in the size, scope, configuration or density of the project. (See *Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 329 [82 Cal.Rptr.2d 649].) Pratt claims it has been trying to develop its parcel for 30 years. The claim is demonstrably untrue. This is the only opportunity the Commission has been given to review a development proposal for this parcel. What development plan, if any, the Commission will approve has yet to be determined.

This case is unlike *Monterey v. Del Monte Dunes at Monterey, Ltd.* (1999) 526 U.S. 687 [143 L.Ed.2d 882, 119 S.Ct. 1624]. There, after five formal decisions and 19 different site plans, a developer brought an action against the city, alleging the city would not permit development of the property under any circumstances. (*Id.* at p. 698.) Here Pratt has presented only one plan to the Commission and the Commission has made only one formal decision. That formal decision does not settle the question of what development will be allowed; nor does it indicate it would be futile for Pratt to submit other development plans.

Pratt's reliance on *Palazzolo* also is misplaced. There the court determined the developer's taking claim was ripe. The state commission's interpretation of its regulations made it clear that no development would be allowed on the wetlands portion of the developer's property. That left only a small upland portion of the parcel available for development. The state had previously accepted that the upland portion of the parcel was suitable for only one

single-family residence and had a value of $200,000. (*Palazzolo v. Rhode Island, supra,* 533 U.S. 606, 621–624.) Here, unlike in *Palazzolo,* it is far from determined how much development can occur on Pratt's property.

Pratt complains in its petition for rehearing that we ignored its motions for reconsideration and a new trial. The motions sought to show that actions taken by the County after the trial court's ripeness ruling preclude development on all but 1,120 square feet of Pratt's parcel. The trial court denied the motions.

We do not consider the motions for the purpose of this appeal because Pratt raised no points on appeal challenging the trial court's denial of the motions; the material contained in the motions was not before the Commission at the time of its decision; and whatever actions the County may have taken subsequent to the Commission's decision are not relevant to Pratt's action against the Commission. The County is not a party to this action.

The judgment is affirmed. Costs on appeal are awarded to respondent.

Yegan, J., and Coffee, J., concurred.

A petition for a rehearing was denied June 9, 2008, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied August 20, 2008, S164446. Kennard, J., and Baxter, J., were of the opinion that the peitition should be granted.