[No. B206428. Second Dist., Div. Six. Dec. 1, 2009.]

DAN REDDELL, Plaintiff and Appellant, v.
CALIFORNIA COASTAL COMMISSION, Defendant and Respondent.

958

COUNSEL

William S. Walter for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, John A. Saurenman, Assistant Attorney General, Christina B. Arndt, Terry T. Fujimoto and Rosana Miramontes, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**PERREN, J.**—Dan Reddell filed a petition for a writ of administrative and ordinary mandate and a complaint for damages and equitable relief against the California· Coastal Commission (Commission). Reddell sought an order requiring the Commission to set aside its decision denying him a coastal development permit under the California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq.) (Coastal Act).[1] The trial court denied the petition for writ of mandate and dismissed the complaint. We affirm.

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

The City of Morro Bay (City) approved permits to allow a residential and commercial development on six lots on the bluffs above the City, in an area zoned for commercial visitor-serving uses. The project as approved by the City consisted of a three- and four-story mixed-use building, with six commercial spaces on the ground floor and six single-family residences on the upper floors. Each residence has a two-car garage, but no provision is made for onsite parking for the commercial spaces. Reddell offered to pay an in-lieu parking fee to provide offsite parking. The ratio of residential to commercial floorspace is greater than three to one.

In approving the project, the City applied an exemption for projects with a planned development overlay, which allows modification of or exemption from the development standards of the primary zone if it would result in better design or other public benefit. The City found the development would provide underground utilities, handicapped-accessible public sidewalks and miniplazas, and the opportunity to master plan a development on six lots.

A third party filed a timely appeal of the decision to the Commission pursuant to the Coastal Act (§ 30603). The appeal asserted that the project violates the City's local coastal plan (LCP) and the Coastal Act because it is

---

[1] All further undesignated statutory references are to the Public Resources Code.

inconsistent with the designated visitor-serving zoning, has inadequate parking, violates height restrictions for bluff-top development, and will block public views. (§§ 30222, 30223, 30251, 30253; see Morro Bay LCP, ch. III, policies 1.07A, 1.25, ch. IV, policies 2.02, 2.08, ch. XIII, policies 12.01, 12.02, 12.06.)

On March 25, 2004, Commission staff submitted a report for a hearing to be held on April 15, 2004. The staff report stated that the project approved by the City raised a substantial issue regarding conformance with policies in the City's LCP regarding public views, neighborhood compatibility, primary zoning, parking, and bluff development. In meetings with staff, Reddell proposed revisions to the project that would remove the fourth floor and increase some setbacks on the upper floors. The report noted the revisions proposed by Reddell would not make the project consistent with the LCP. Staff recommended that the Commission approve the project with conditions designed to resolve issues regarding visual resources, neighborhood compatibility, parking, and consistency with underlying zoning.

At the hearing, a presentation was made by a representative of the development. Her presentation included a slide show including the revisions proposed by Reddell to reduce the height and scale of the building. She stated that the project came within the 30-foot height limitation in the commercial visitor-serving zone and met the standards for bluff development in the City's zoning code. She also stated that calculation of the residential/commercial ratio should not include the garage area. She pointed out that there were nine 3-story projects within a three-block radius of the project site, and the project was in character with the community. Reddell added a brief comment requesting approval of the project as revised.

A letter from the City's mayor in favor of the project was read into the record. Numerous residents spoke in opposition to the project. Reddell's representative responded to criticisms of the project. She pointed out that some of the slides showing a simulation of the building project were taken with a telephoto lens which distorted its height and bulk. She added that with the revisions proposed by Reddell, the project would meet LCP and Coastal Act standards.

Following the presentation, each commissioner commented on the project. They expressed concerns regarding the ratio of commercial to residential uses, lack of onsite parking, and the height and scale of the project. The Commission rejected the recommendation of staff that the project be approved with conditions, and voted unanimously to deny the project as inconsistent with the City's LCP policies with respect to bluff development, visual resources, parking, visitor-serving priorities, and community character.

On June 9, 2004, the Commission adopted revised findings prepared by staff supporting denial of the project. Prior to the Commission's adoption of the revised findings, Reddell submitted a lengthy written rebuttal to the proposed findings, including revised photographic simulations that corrected the purportedly distorted photographs presented earlier.

On June 11, 2004, Reddell filed a petition for writ of administrative and ordinary mandate and a complaint for damages alleging violation of his right to due process and equal protection, and a regulatory taking of property. Upon stipulation of the parties, the petition was severed from the complaint for hearing. The trial court denied the petition and subsequently granted the Commission's motion for judgment on the pleadings and dismissed the complaint.

On appeal, Reddell contends the Commission exceeded its jurisdiction because it reviewed the "wrong project," misinterpreted LCP policies, and made findings that were not supported by substantial evidence. He also asserts the trial court erred in dismissing the complaint because his claim for damages survives denial of the petition for writ of mandate.

## DISCUSSION

### Standard of Review

In reviewing a decision denying a petition for administrative mandate, our role is identical to that of the trial court. "We review the administrative record to determine whether the Commission's findings are supported by substantial evidence." (*LT-WR, L.L.C. v. California Coastal Com.* (2007) 152 Cal.App.4th 770, 780 [60 Cal.Rptr.3d 417].) To the extent the case involves the interpretation of a statute, which is a question of law, we engage in a de novo review of the trial court's determination. (*Ibid.*) " 'Courts may reverse an agency's decision only if, *based on the evidence before the agency*, a reasonable person could not reach the conclusion reached by the agency.' " (*La Costa Beach Homeowners' Assn. v. California Coastal Com.* (2002) 101 Cal.App.4th 804, 814 [124 Cal.Rptr.2d 618].)

### Coastal Commission Regulatory Authority

■ In *Charles A. Pratt Construction Co., Inc. v. California Coastal Com.* (2008) 162 Cal.App.4th 1068 [76 Cal.Rptr.3d 466] (*Pratt*), we described the regulatory hierarchy imposed by the Coastal Act. "Under the Coastal Act's legislative scheme . . . , the LCP and the development permits issued by local agencies pursuant to the Coastal Act are not solely a matter of local law, but

embody state policy. The Commission's primary responsibility is the implementation of the Coastal Act. It is designated the state coastal zone planning and management agency for any and all purposes. (§ 30330.) . . . Once the Commission certifies the LCP and all implementing actions become effective, the Commission's authority over coastal development permits is 'delegated to the local government . . . .' (§ 30519, subd. (a).) . . . [T]he Commission has appellate jurisdiction to determine whether the development permit issued by the local government is consistent with the LCP and coastal access policies. (§ 30603, subd. (b).)

 "Although local governments have the authority to issue coastal development permits, that authority is delegated by the Commission. The Commission has the ultimate authority to ensure that coastal development conforms to the policies embodied in the state's Coastal Act. In fact, a fundamental purpose of the Coastal Act is to ensure that state policies prevail over the concerns of local government. [Citation.] The Commission applies state law and policies to determine whether the development permit complies with the LCP." (*Pratt, supra,* 162 Cal.App.4th at pp. 1075–1076.)

### The Commission's Interpretation of LCP and Coastal Act Provisions Is Reasonable, and Substantial Evidence Supports Its Decision

*Visitor-serving Priorities*

The project is located within a visitor-serving commercial district (C-VS) with a planned development (PD) and special design criteria (S.4) overlay. Reddell asserts the Commission erred in finding the project did not meet zoning standards and policies related to visitor-serving priorities. He contends in the alternative that the project is entitled to an exemption from zoning requirements because, as the City found, it will provide greater than normal public benefits.

The Commission found in part: "The total amount of floor area space dedicated to visitor-serving commercial uses is 5,135 square feet or roughly (23%) of the total enclosed building area. Roughly 14,405 square feet is dedicated to residential living space and another 3,150 square feet for enclosed residential garages. There is also more than 2,250 square feet of residential balconies, porches, walks, and decks proposed. Though there are not any specific size limits for residential units in the C-VS district, the current ratio of residential to commercial use is more than 3:1. Gross structural coverage attributed to the residential use approaches 79%. . . . [¶] . . . [¶]

"[T]he City-approved development is not consistent with the underlying zoning standard . . . that allows a single apartment unit or security quarters only when secondary to permitted commercial uses and [located] on the rear one-half of a lot or upper story. Applicant suggests that establishing secondary uses is as simple as determining that all uses will be located on the second floor. The applicant fails to observe that the standard has two criteria and clearly states the residential use must be secondary _and_ located on the rear one-half of the lot _or_ upper story, indicating that secondary implies some additional limitation on residential use. The descriptive terms 'single apartment unit' or 'security quarter' also imply a small residential unit. Secondary uses as it is interpreted within the context of the entire standard, implies that they are inferior or subordinate to primary uses. . . . Similarly, with respect to height and massing, the residential uses are not subordinate. Even with respect to provision of off-street parking, the residential uses are not subordinate to the visitor-serving commercial aspects of the project. [¶] . . . [¶]

"The City's approval includes an exemption from the 30' height limit for development within the visitor-serving commercial zone. In justifying the need to invoke the PD exemptions, the City found that the project provided an opportunity to master plan six parcels at once and obtain all of the street frontage improvements at the same time. The City also [c]ited the project's site design and creative architecture, agreement to underground utilities, as well as an opportunity to advance community goals promoting mixed-use development that it believes will draw tourists from the Embarcadero to the downtown area.

"The City's approval does not, however, demonstrate that the exemptions will result in greater than normal public benefits. . . . [¶] . . . [¶]

"As noted above, these improvements may, in fact, benefit the public, but they do not appear to constitute greater than normal public benefits and could be expected to be required of any proposal. . . .

"As approved by the City, the proposed development is inconsistent with the underlying zoning standards of the LCP and a substantial revision of the project plans will be necessary to bring the project into conformance with the certified LCP. These revisions are beyond the scope of the Commission's ability to redesign the project for the applicant, but if undertaken by the applicant, should include/require a more even balance between primary and secondary uses, address the overall height of the building, and limit the number of vertical stories on the primary elevations to ensure the project is consistent with the standards identified in the underlying visitor serving commercial zoning."

The trial court found: "The Commission determined in its findings that the residential use of the project was not secondary to permitted commercial uses as required by the LCP. . . . The square footage of the project devoted to residential use was much greater than that devoted to commercial uses, [even with Reddell's proposed modifications], and the square footage of the residential units were larger, on average, than the average square footage of a single family residence in Morro Bay. The Commission also disagreed with the City's decision that the Project is entitled to a PD exemption from normal zoning because it would result in greater than normal public benefits. The Commission found that increased commercial use would be a better way to revive the City's revenue stream, the Project obstructs significant coastal views of Morro Rock and the bay, the residential housing is not low cost, and that the exemption is not necessary to protect public access and sensitive habitats."

Reddell argues that the Commission's interpretation of the applicable LCP policies is erroneous because it used the ratio of commercial to residential square footage to determine primary and secondary uses. Reddell asserts that, despite the three-to-one ratio of residential to commercial based on square footage, commercial is the primary use of the building because that use is on the ground floor, while the residential use is on the upper floors. Reddell also asserts that including the square footage of the garages in the ratio is erroneous.

Section 17.24.120 of the City's zoning code, incorporated into the LCP, states in part: "The purpose of the visitor-serving commercial (C-VS) district is to provide a district for commercial uses intended primarily to serve the needs of tourists and other visitors to the city and not to include commercial uses of a more general nature which are oriented towards residents." In the zoning code, table 17.24.120 (I) states: "Unless otherwise designated, the following uses, or other uses which are found to be similar and consistent with the general plan and local coastal plan may be allowed with the appropriate permits and licenses: [¶] A single apartment unit or security quarters only when secondary to permitted commercial uses and on the rear one-half of a lot or upper story."

We generally defer to an agency's interpretation where the agency " 'possess[es] special familiarity with satellite legal and regulatory issues' . . . ." (*Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, 1289 [38 Cal.Rptr.3d 316].) Therefore, while we exercise our independent judgment in reviewing the Commission's interpretation of the Coastal Act and LCP policies, we exercise that judgment " ' " 'giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action.' [Citation.]" ' " (135 Cal.App.4th at p. 1289.)

■ "Absent a compelling reason to do otherwise, we strive to construe each statute in accordance with its plain language." (*Collection Bureau of San Jose v. Rumsey* (2000) 24 Cal.4th 301, 310 [99 Cal.Rptr.2d 792, 6 P.3d 713].)

■ The plain language of the regulation indicates an intent to limit development in the C-VS zone to "commercial uses intended primarily to serve the needs of tourists and other visitors to the city." Residential use is permitted only to the extent that it is necessary to facilitate maintenance of the commercial uses, i.e., "[a] single apartment unit or security quarters."

Whether the determination of primary and secondary uses is based on square footage or some other method, the project violates the letter and spirit of the C-VS zoning designation because it consists of six residential units, many more than the "single apartment unit or security quarters" permitted by the regulation, and these residential uses are not "commercial uses intended primarily to serve the needs of tourists and other visitors to the city."

In the alternative, Reddell asserts that the project should be approved despite its inconsistency with the primary zoning of the property because the City found that the project provides greater than normal benefits to the City. Section 17.40.030A of the City's zoning code states: "The purpose of the planned development (PD) overlay zone, is to provide for detailed and substantial analysis of development on parcels which, because of location, size or public ownership, warrant special review. This overlay zone is also intended to allow for the modification of or exemption from the development standards of the primary zone which would otherwise apply if such action would result in better design or other public benefit."

Section 17.40.030D of the City's zoning code states: "The standards for development within a PD overlay zone shall be those of the base zoning district, provided however, that standards may be modified by the planning commission or city council as they relate to: building heights; yard requirements; and minimum lot area for dwelling units in the density range provided that any specific design criteria of the general plan and coastal land use plan, applicable to the property, is not exceeded. . . . Modifications of standards shall only be approved upon a finding that greater than normal public benefits may be achieved by such deviations. Such benefits may include, but are not limited to improved or innovative site and architectural design, greater public or private usable open space and provisions of housing for the elderly or low/moderate income families, provision of extraordinary public access, provision for protecting environmentally sensitive habitat (ESH) areas, but in all cases these provisions shall meet the coastal land use policies."

■ These regulations give the Commission broad discretion to make a benefit/detriment analysis. The Commission is not bound by the findings or

decision of the City. (§ 30604; *Pratt, supra,* 162 Cal.App.4th at p. 1077 ["if the Commission were bound by the County's finding that the project complies with the LCP, there would be no reason to allow an appeal to the Commission"].)

The Commission did not abuse its discretion in determining that the benefits the project would provide do not outweigh substantially deviating from LCP and Coastal Act policies. The Commission did not abuse its discretion by misinterpreting the zoning regulations or failing to find that the project would provide greater than normal public benefits. Its findings in this respect are supported by substantial evidence. (See *Dore v. County of Ventura* (1994) 23 Cal.App.4th 320, 326–327 [28 Cal.Rptr.2d 299] ["Because the administrative agency has technical expertise to aid it in arriving at its decision, we should not interfere with the discretionary judgments made by the agency."]; see also *Lindell Co. v. Board of Permit Appeals* (1943) 23 Cal.2d 303, 315 [144 P.2d 4] [in a land use case, " 'Courts should let administrative boards and officers work out their problems with as little judicial interference as possible. . . . Such boards are vested with a high discretion and its abuse must appear very clearly before the courts will interfere.' "].)

■ The Commission's findings that the project is inconsistent with its zoning designation is sufficient by itself to affirm denial of the coastal development permit. (See *Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1212–1214 [30 Cal.Rptr.2d 95] [it is not necessary that every finding be supported by substantial evidence, as long as the findings that are supported by substantial evidence are sufficient to support the decision of the Commission]; see also *Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 336–337 [25 Cal.Rptr.2d 842] [same].) Nonetheless, we will briefly discuss Reddell's remaining contentions.

*Bluff Development*

Building height and setback requirements for the project are subject to LCP policies and zoning ordinances which define the location of the edge of the bluff on which the building will be constructed. The standards applicable to development on the bluffs are primarily concerned with the natural condition of the bluffs. For example, section 17.45.010D of the City's zoning code states that one purpose of the specified standards is "[t]o maintain the unique geographic features of the bluffs and ensure development is subordinate to the character and form of the coastal bluff areas."

Reddell asserts that because of the unique history of the bluff at the project site, it is appropriate to use the standard generally applicable in the City

instead of those in the LCP. That ordinance calculates building height by measuring vertical distances from grades in existence on January 1, 1986. On that date, the grade of the project site was established by a retaining wall. The wall subsequently collapsed in a major storm in March 1995. Soil eroded from the face of the bluff, and at some points the existing face of the bluff is 20 feet below the height of the grade when the retaining wall was in existence. Therefore, the west (bluff) side of the project was not in a natural condition when the retaining wall was in place.

■ A determination of which standard to apply to measure building height and setbacks with reference to the existing bluff is primarily a policy decision. Under the Coastal Act, the Commission has the discretion to make that decision. As stated previously, we must defer to the Commission's interpretation because it is reasonable and in keeping with the purposes of the LCP. (*Alberstone v. California Coastal Com.* (2008) 169 Cal.App.4th 859, 866 [86 Cal.Rptr.3d 883]; see also *Divers' Environmental Conservation Organization v. State Water Resources Control Bd.* (2006) 145 Cal.App.4th 246, 252 [51 Cal.Rptr.3d 497] [" '. . . we must also defer to an administrative agency's interpretation of a statute or regulation involving its area of expertise, unless the interpretation flies in the face of the clear language and purpose of the interpreted provision' "].)

*Visual Resources*

Section 30251 states in part: "The scenic and visual qualities of coastal areas shall be considered and protected as a resource of public importance. Permitted development shall be sited and designed to protect views to and along the ocean and scenic coastal areas, to minimize the alteration of natural land forms, to be visually compatible with the character of surrounding areas, and, where feasible, to restore and enhance visual quality in visually degraded areas."

Reddell asserts the Commission failed to consider his proposed revision that would remove the fourth floor from some of the building's elevations. Again, the record is to the contrary. At the hearing, the commissioners expressed concern with the height and scale of the project and its incompatibility with policies governing visual resources. The findings note that the revised building height without a fourth floor still exceeds the 14-foot maximum imposed by the bluff development standards. In essence, Reddell is asking this court to reweigh the evidence which the Commission considered. We decline to do so.

*Parking*

Residential parking for the project was found by the Commission to be adequate. However, the Commission found provisions for commercial, offsite

parking to be inadequate. The LCP calls for the creation and implementation of a parking management program. LCP policies require adequate off-street parking to serve the needs of a development. One policy states: "Once an approved parking management program for the City providing off-street parking resources has been developed and implemented as part of the LUP, new development shall be allowed to satisfy parking requirements through participation in such a program. If the program includes an in-lieu fee system, the new development shall provide an in-lieu fee of an amount equal to the purchase of land and construction of the number of spaces needed to serve the development's needs." (Morro Bay LCP, ch. III, policy 1.07A.) A second policy requires offsite parking for visitor-serving development to be within 300 feet of the development site. (*Id.*, policy 2.08.)

The record contains a City parking program which appears to have been certified by the Commission. However, the issue before the Commission was not whether an in-lieu parking fee should be permitted, but rather the adequacy of the amount of fee—$4,000—charged for each in-lieu parking space.

■ Denial of land use permits for lack of adequate parking has a long history. (*Martin v. Alcoholic Bev. etc. Appeals Bd.* (1959) 52 Cal.2d 238, 248–249 [340 P.2d 1].) As with other Coastal Act policies, the Commission has discretion to determine adequacy of parking for development in the coastal zone. The Commission did not abuse its discretion when it found that the provisions for commercial offsite parking did not satisfy LUP (land use plan) and Coastal Act standards. (See, e.g., *Jeffery v. City of Salinas* (1965) 232 Cal.App.2d 29, 37–38 [42 Cal.Rptr. 486] [city's determination whether parking was adequate involves factual determinations and is binding on the court].) Although reasonable minds might differ as to the adequacy of the parking fee, the determination of the question falls within the broad discretion the Commission is empowered to exercise in protecting coastal resources.

*Community Character*

The Commission found that the proposed project was inconsistent with LCP policies protecting the unique character of the City's embarcadero and surroundings. The project, in the opinion of the Commission, would be a dominant feature and not a subordinate feature to the bluff. "This structure will loom over existing development and become the dominant feature of the site." The Commission recommended that revised plans be prepared to ensure compatibility with surrounding development by designing a project that reflects the mass and height relationships of adjacent development.

■ Reddell contends that the Commission's findings mischaracterize the surrounding areas and singles out only sites that support the conclusions of

the Commission's findings. A decision on the compatibility of the project with the surrounding area is a subjective decision. (See *Dore v. County of Ventura, supra*, 23 Cal.App.4th at pp. 328–329 ["In reviewing a proposed project, the administrative body is entitled to consider subjective matters such as the spiritual, physical, aesthetic and monetary effect the project may have on the surrounding neighborhood."].) Evidence in the record provides a basis for concluding that the project is larger in scale and different in architectural style than the surrounding area. A reasonable person could reach the same conclusion as the Commission; therefore, the Commission's decision must be upheld.

### *The Commission Had No Duty to Approve a Revised Project*

Reddell asserts the Commission reviewed the "wrong project" and failed to consider the revisions he made to the project during the course of the administrative proceedings. The record tells a different story. At the hearing before the Commission, Reddell's representative presented the revisions Reddell proposed in response to concerns expressed by Commission staff. Reddell also ·submitted a written rebuttal to the Commission's proposed findings, including revised photographic simulations.

The record shows that the Commission considered but was not persuaded by Reddell's revised plans. For example, the findings note that the revised building height without a fourth floor still exceeds the 14-foot maximum imposed by the bluff development standards. Contrary to Reddell's assertion, the Commission's final revised findings are adequate to "enable the parties to determine whether and on what basis they should seek review and, in the event of review, to apprise a reviewing court of the basis for the board's action." (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514 [113 Cal.Rptr. 836, 522 P.2d 12]; see *Sierra Club v. California Coastal Com.* (1993) 19 Cal.App.4th 547, 556 [23 Cal.Rptr.2d 534] [" 'where reference to the administrative record informs the parties and reviewing courts of the theory upon which an agency has arrived at its ultimate finding and decision it has long been recognized that the decision should be upheld if the agency "in truth found those facts which as a matter of law are essential to sustain its . . . [decision] . . ." . . .' "]; see also *Mira Development Corp. v. City of San Diego* (1988) 205 Cal.App.3d 1201, 1222–1223 [252 Cal.Rptr. 825] [failure to make findings harmless error where record showed basis of agency's decision].)

██ Reddell argues his revisions during the review process responded to all the concerns raised by Commission staff and therefore the Commission should have approved the project. We disagree. The Coastal Act sets only minimum standards and policies and creates no mandatory duty to issue

development permits. (*Yost v. Thomas* (1984) 36 Cal.3d 561, 572 [205 Cal.Rptr. 801, 685 P.2d 1152].)

■ Alternatively, Reddell asserts that, instead of denying the project, the Commission should have approved it with conditions. This contention was considered and rejected by the court in *Bel Mar Estates v. California Coastal Com.* (1981) 115 Cal.App.3d 936 [171 Cal.Rptr. 773]. The court stated: "While, in some cases, the commission may find that, with relatively minor changes, a proposal may be modified so as to reduce effectively the environmental impact, we know of no requirement that the commission must, in every case, undertake to redesign a proposal so as to become acceptable." (*Id.* at p. 942; see also *LT-WR, L.L.C. v. California Coastal Com., supra*, 152 Cal.App.4th at p. 801 ["the Commission is not required to redesign an applicant's project to make it acceptable"].)

The Commission has broad discretion in reviewing a project in the coastal zone. As stated by our Supreme Court in one of the earliest cases challenging the Commission's authority, "[e]ven the most cursory examination of the Act reveals that determination of whether an applicant qualifies for a permit is entrusted to the Commission's discretion. Thus, a permit may not issue unless the Commission finds, for example, that the development will not have any substantial adverse environmental or ecological effect [citation] or irreversibly commit coastal zone resources, and that the proposed development will enhance the environment of the coastal zone [citations]. The application of these factors requires the Commission to undertake a delicate balancing of the effect of each proposed development upon the environment of the coast as a predicate to the issuance of a permit. This process is manifestly inconsistent with an assertion that the Commission's functions in this regard are purely ministerial in character." (*State of California v. Superior Court* (1974) 12 Cal.3d 237, 247–248 [115 Cal.Rptr. 497, 524 P.2d 1281].)

### *The Trial Court Did Not Err in Dismissing the Complaint*

After the trial court denied Reddell's petition for writ of mandate, it granted the Commission's motion for judgment on the pleadings and dismissed Reddell's complaint for damages for a regulatory taking. Reddell asserts this was error because he has stated a claim for a regulatory taking of property.

"The standard of review for a motion for judgment on the pleadings is the same as that for a general demurrer: We treat the pleadings as admitting all of the material facts properly pleaded, but not any contentions, deductions or conclusions of fact or law contained therein. We may also consider matters subject to judicial notice. We review the complaint de novo to determine

whether it alleges facts sufficient to state a cause of action under any theory." (*Dunn v. County of Santa Barbara, supra,* 135 Cal.App.4th at p. 1298.)

The trial court granted the Commission's motion and dismissed the complaint, finding that its decision to deny Reddell's petition for writ of mandate because the Commission conducted a fair hearing, did not proceed in excess of its jurisdiction and did not abuse its discretion in disposing of his claims for violation of due process and equal protection. It dismissed the takings claim on the ground that the claim was not ripe. We agree.

Our affirmance of the trial court's denial of the petition for writ of mandate necessarily disposes of Reddell's claims for denial of due process and equal protection. (See *LT-WR, L.L.C. v. California Coastal Com., supra,* 152 Cal.App.4th at p. 802 ["The determination the Commission acted properly . . . moots LT-WR's claims that the Commission's conduct violated its constitutional and civil rights."].)

■■■ The question whether property has been taken is not ripe for decision until a government agency has rendered a final decision on the uses to which the property may be put. (*LT-WR, L.L.C. v. California Coastal Com., supra,* 152 Cal.App.4th at p. 801; *Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 325 [82 Cal.Rptr.2d 649].)

Reddell's reliance on our decision in *Dunn v. County of Santa Barbara* is misplaced. In that case, we concluded a takings claim was ripe for adjudication because the county had repeatedly indicated that it would limit the development of the petitioner's property to one residence. (*Dunn v. County of Santa Barbara, supra,* 135 Cal.App.4th at pp. 1299–1300.) We agree with the trial court's conclusion: "In the present case the permissible uses of the property are not yet known to a reasonable degree of certainty. Although the Commission has identified deficiencies in the Project as presented, and is willing to consider a redesigned Project, Reddell has made no attempt to revise the Project."

The Commission identified feasible alternatives to the project. Until such time as a final decision has been made by the Commission, a takings claim is not ripe for adjudication. As we stated in *Pratt, supra,* 162 Cal.App.4th at page 1082: "[The petitioner] is not entitled to whatever project [he] desires. [The petitioner] has yet to submit proposals that contemplate a reduction in the size, scope, configuration or density of the project. . . . This is the only opportunity the Commission has been given to review a development proposal for this parcel. What development plan, if any, the Commission will approve has yet to be determined." (Citation omitted.)

*Conclusion*

 Reddell's challenges to the Commission's decision to deny his application for a coastal development permit directly implicate factual disputes that were decided against him in the administrative proceedings. "Each of the Commission's reasons for denying the permit is supported by the record. Any one of them is sufficient to sustain the denial." (*Pratt, supra,* 162 Cal.App.4th at p. 1080.)

A denial of the petition necessarily disposes of Reddell's claims that he was denied due process and equal protection. The Commission has indicated its willingness to review a revised proposal. There is nothing in the record, and we may not presume, that the Commission will fail to do so. Therefore, his claim for damages for a regulatory taking of property is not ripe.

The judgment is affirmed. Respondent shall recover costs on appeal.

Gilbert, P. J., and Coffee, J., concurred.

A petition for a rehearing was denied December 29, 2009, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied March 24, 2010, S180132.