Filed 12/9/20  Rudisill v. California Coastal Commission CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| ROBIN RUDISILL et al., | B294460 |
| Plaintiffs, Respondents, and Cross-Appellants, | (Los Angeles County Super. Ct. No. BS168074) |
| v. | |
| CALIFORNIA COASTAL COMMISSION, | |
| Defendant, Appellant, and Cross-Respondent, | |
| LIGHTHOUSE BROOKS, LLC et al. | |
| Real Parties in Interest, Appellants, and Cross-Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  James C. Chalfant, Judge.  Reversed with directions.

Xavier Becerra, Attorney General, Daniel A. Olivas, Senior Assistant Attorney General, Christina Bull Arndt, Supervising Deputy Attorney General, and Wyatt E. Sloan-Tribe, Deputy Attorney General, for Defendant, Appellant, and Cross-Respondent.

Gaines & Stacey, Fred Gaines, and Lisa A. Weinberg, for Real Parties in Interest, Appellants, and Cross-Respondents.

Venskus & Associates and Sabrina Venskus, for Plaintiffs, Respondents, and Cross-Appellants.

————————————————

## INTRODUCTION

The City of Los Angeles issued Lighthouse Brooks, LLC and Ramin Kolahi (collectively, Lighthouse) a coastal development permit to build four homes on two adjacent lots in Venice (the Project). For nearly three years the City failed to send notice of the permit to the California Coastal Commission, as required by the California Coastal Act of 1976, Public Resources Code section 30000 et seq. After the City finally sent the notice to the Commission, Venice residents Robin Rudisill and Jenni Hawk filed an appeal of the City's decision to issue the permit. The Commission staff initially recommended the Commission deny the permit on the ground the Project was not compatible with the surrounding neighborhood. At the hearing, however, the Commission voted to issue the permit.

Rudisill and Hawk filed a petition for a writ of mandate to direct the Commission to set aside its decision. While the writ was pending, the Commission issued a revised report finding the Project was compatible with the neighborhood and complied with

2

the Coastal Act. The trial court granted Rudisill and Hawk's petition, ruling that the Commission abused its discretion by approving the permit before determining the Project complied with the Coastal Act and that the Commission's revised findings were a post hoc rationalization for its decision. The Commission and Lighthouse appeal, contending that the Commission did not abuse its discretion and that the Commission's decision to issue the permit was supported by substantial evidence. Rudisill and Hawk cross-appeal, contending substantial evidence did not support the Commission's findings. We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Coastal Act*

"The Coastal Act 'was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California.'" (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 793 (*Pacific Palisades*).) With certain exceptions, "any person wishing to perform or undertake any development" (*id.* at p. 794) in the defined "coastal zone" (Pub. Resources Code, § 30103) "shall obtain a coastal development permit" (*id.*, § 30600, subd. (a)).[1] The Act "requires local governments to develop local coastal programs, comprised of a land use plan and a set of implementing ordinances designed to promote the act's objectives . . . ." (*Pacific Palisades*, at p. 794; see §§ 30500, subd. (a), 30512, 30513.) After the Commission "certifies a local government's program, and all implementing actions become

[1] Undesignated statutory references are to the Public Resources Code.

3

effective, the commission delegates authority over coastal development permits to the local government." (*Pacific Palisades*, at p. 794; see § 30519, subd. (a).) While the Commission has certified a land use plan for the Venice neighborhood of Los Angeles, it has not certified a complete local coastal program.

Even "'[p]rior to certification of its local coastal program,'" however, "'a local government may, with respect to any development within its area of jurisdiction . . . , establish procedures for the filing, processing, review, modification, approval, or denial of a coastal development permit.'" (*Pacific Palisades*, *supra*, 55 Cal.4th at p. 794; see § 30600, subd. (b)(1).) Where a local government issues or denies a coastal development permit "[p]rior to certification of its local coastal program," the permit decision may be appealed to the Commission. (§ 30602.) The local government must notify the Commission of its decision. (§ 30620.5, subds. (c), (d).) The decision becomes final "at the close of business on the 20th working day from the date of receipt of the notice" from the local government, "unless an appeal is submitted within that time." (§ 30602.)

> B.  *The City Issues a Coastal Development Permit for the Project, but Fails To Give Notice to the Commission; Three Years Later, Rudisill and Hawk File an Appeal with the Commission*

In February 2013 Lighthouse submitted an application to the City for a coastal development permit for the Project. The Project is located in the Oakwood neighborhood of Venice, approximately three-fourths of a mile from the coast and less

4

than one block from the inland boundary of the coastal zone. Lighthouse proposed demolishing an existing duplex and triplex on two adjacent lots, dividing those lots into four lot subdivisions, and constructing a new three-story single-family home on each lot subdivision. Each of the four proposed structures would be 30 feet tall, with a five-foot setback between the front of the structure and the third story. The side setback between each structure and lot subdivision would be between zero and five feet. Each structure would cover approximately 50 percent of the lot area of the subdivision, and the square-foot-to-lot ratio of each home and lot would be approximately one to one.

In October 2013 the City issued a coastal development permit for the Project, finding that the Project complied with the Coastal Act. The City, however, did not send notice of the permit to the Commission, as required by section 30620.5. Between October 2013 and August 2016, Lighthouse completed approximately 90 percent of construction for the Project.

In August 2016 the Commission learned about the Project and informed the City and Lighthouse that the Commission had not received notice of the City's coastal development permit.[2] In September 2016 the City sent the Commission notice of the permit it had issued for the Project in 2013. Six days later, Rudisill, Hawk, and several other Venice residents filed an appeal with the Commission of the City's decision to issue the permit. Rudisill and Hawk challenged the permit on several grounds, including that the Project would violate the

---

[2] Two events caused the Commission to learn about the Project: A water main ruptured, causing a sinkhole near the Project site, and a contractor hired by Lighthouse was shot and killed at the site.

5

Commission's certified Venice Land Use Plan because it was "not compatible with the mass, scale and character of the existing neighborhood . . . ."

C.    *The Commission Approves the Permit*

In November 2016 Commission staff prepared a report recommending the Commission deny Lighthouse a permit for the Project because the Project was "not visually compatible with the character of the surrounding area and would adversely affect the special community of Venice" and therefore would violate the Coastal Act.  According to the report, the block where the Project was located and the Oakwood neighborhood consist primarily of one- or two-story single-family homes and one- or two-story multi-unit structures.  The report stated that developers had built other three-story and 30-foot homes in the neighborhood, including homes on the same block as the Project, but that in those cases the developers had built one home or two homes on a single lot—not four homes on two lots.  The report stated that the Venice Land Use Plan encourages "'varied styles of architecture . . . with building facades which incorporate varied planes and textures,'" but that the "design of the four proposed homes" was "nearly identical" and did "not feature substantial articulation." The report also pointed out the Commission had never approved new homes with zero-foot side setbacks, as Lighthouse had proposed.

Prior to the hearing, Lighthouse submitted a written response to the appeal.  The response included several pictures of the street immediately surrounding the Project.  The pictures showed that the Project was less than one block away from a major commercial boulevard, that there was a three-story

6

condominium building with no articulation at the end of the block, and that there were three similar, side-by-side three-story homes on the block. The pictures also revealed three other 25-foot-tall homes on the same block. In addition to submitting evidence of other residential structures in the neighborhood, Lighthouse proposed reducing the height of the privacy walls on the balconies, using neutral colors, modifying doors, and revising the landscape in the front yards of the homes of the Project to conform more closely with the surrounding neighborhood. At the hearing, Lighthouse supplemented the information it had submitted in its written response with additional pictures showing two-story and three-story residential structures on streets adjacent to the block where the Project was located.

After the parties' presentations, four commissioners spoke in support of issuing a permit for the Project. Each condemned the City for failing to promptly send notice of the permit to the Commission. Commissioner Olga Diaz stated: "If we're going to be upset with anybody it's the city of Los Angeles. I don't know how we remedy that, but it does feel like an injustice to take it out on the person who did genuinely seem to try to do everything right. I don't want to perpetuate injustice here." Commissioner Martha McClure stated: "I agree that it was the City of L.A. that, not only did they drop the ball, they hid the ball. . . . The applicant should not have to carry that entire burden themselves. . . . Maybe we're going to put a little teeth in City of L.A." Commissioner Mary Luevano concurred with Diaz's and McClure's comments about the City and agreed Lighthouse was not "at fault for the position the City's put them in." Commissioner Dayna Bochco stated she was going to vote to approve the permit because of the City's three-year delay and

because "it would be inequitable to go forward with the staff recommendation."

Commissioners Diaz, Luevano, and Bochco also indicated they believed the Project was either similar to other homes in the neighborhood or to other developments the Commission had previously approved. Commissioner Diaz stated: "If we had a chance to start from scratch we probably would have some additional suggestions, but . . . we would approve something very close to this, I think, based on approvals we've granted for other projects. They don't look that different than this." Commissioner Luevano stated: "Following up on what Commissioner Diaz said, I don't feel like this project is going to be drastically different from some of the other projects in this neighborhood. I used to live in the neighborhood adjacent. I know this area very well." Commissioner Bochco observed that Lighthouse had already made changes to the original project design and that there were "a lot of qualities to these buildings that we would've asked for," including the third-story setback. Commissioner Steve Kinsey stated he would only support issuing a permit if it included the additional changes Lighthouse proposed to make to the Project.

The Commission voted to issue the permit with the conditions and modifications proposed by Lighthouse. Nine commissioners voted in favor of issuing the permit and two voted against issuing it.

D.    *Rudisill and Hawk File a Petition for Writ of Mandate*

In February 2017 Rudisill and Hawk filed a petition for writ of mandate in the Los Angeles County Superior Court, asking the court to direct the Commission to set aside its decision. Rudisill and Hawk alleged the Commission abused its

8

discretion because it approved the permit for the Project without finding that the Project complied with the Coastal Act.

In May 2017 the Commission adopted a report with revised findings prepared by the Commission's staff pursuant to California Code of Regulations, title 14, section 13096, which directs the Commission to adopt revised findings in the event the Commission does not follow the staff's recommendation. The revised findings stated that approximately 10 percent of the buildings on the block where the Project was located had three stories and that the Project was "not drastically different" or "substantially visually distinct . . . with respect [to] scale, massing, and landscape" from other structures in the neighborhood. The revised report observed that, although the zero-foot setbacks between residences were unusual, there were other small lot subdivisions in Venice with zero-foot setbacks. The report also stated that, although Lighthouse's modifications to the façade and landscaping would not reduce the mass and scale of the Project, they "do make the [Project] align more closely with the neighborhood character . . . ."[3]

---

[3] A document comparing the original with the revised report showed that the staff changed, for example, "this design does not substantially change the cumulative massing" to "this introduces some articulation in the design," "out of character with the block" to "unusual for the block," and "[t]he [P]roject would not be consistent with Venice Land Use Policy" to "[t]he [P]roject, as conditioned, is consistent with Venice Land Use Policy." The staff also changed "Approval of this development would set a precedent for out of scale development in Venice, and additional development of this type (massive structures side by side with minimal articulation and lack of architectural diversity) would adversely affect the community character of Venice" to "Approval

9

Rudisill and Hawk filed an amended petition for writ of mandate, alleging the Commission's revised findings were a post hoc rationalization that did not accurately reflect the Commission's reasons for approving the permit at the hearing. Rudisill and Hawk further alleged substantial evidence did not support the Commission's finding that the Project complied with the Coastal Act.

E. *The Trial Court Grants the Petition*

After the parties submitted briefs in support of and in opposition to the petition, the trial court issued a tentative decision to grant the petition. The trial court tentatively ruled that, under California Code of Regulations, title 14, section 13096, any revised findings issued after the Commission renders a decision at a hearing must reflect the action of the Commission at the hearing. The trial court tentatively ruled the Commission's revised findings were impermissible post hoc rationalizations because the findings made "no mention of the fairness and City fault that clearly was the basis of the prevailing Commissioners' decision." The court's tentative ruling stated that, although the Commissioners made general comments about the neighborhood, there was "nothing in the prevailing Commissioners' comments that support[ed] th[e] deviation" from the staff's recommendation.

The court also stated in its tentative decision that substantial evidence did not support the Commission's finding

_____

of this development would not set a precedent for out of scale development in the neighborhood or in Venice, as each project is unique and must be considered in the context of its specific location and facts."

10

the Project was visually compatible with the surrounding neighborhood. At the hearing, however, the court orally modified this portion of its tentative decision after counsel for Lighthouse presented the pictures of the neighborhood counsel had submitted to the Commission during the hearing. The trial court stated: "The photographic evidence presented to me at this hearing, which was also presented to the Coastal Commission, may be relied upon by the Commission to go the other way. In other words, I'm not concluding that there is or there isn't substantial evidence to uphold [the Permit]." The court otherwise adopted its tentative decision.

The trial court entered judgment and issued a writ of mandate directing the Commission to void the permit and "reconsider the Project." The Commission and Lighthouse appealed, and Rudisill and Hawk cross-appealed.

## DISCUSSION

A.  *Standard of Review*

"Any aggrieved person" under the Act has the "right to judicial review of any decision or action of the commission by filing a petition for writ of mandate in accordance with [Code of Civil Procedure] Section 1094.5 . . . ." (§ 30801; see *SLPR, L.L.C. v. San Diego Unified Port Dist.* (2020) 49 Cal.App.5th 284, 321 ["'administrative mandamus is the "proper and sole remedy" for challenging or seeking review of' a [Commission] decision"].) "[T]he trial court reviews the commission's decision to determine whether the commission 'proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is

11

established if the [Commission] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.'" (*Mountainlands Conservancy, LLC v. California Coastal Com.* (2020) 47 Cal.App.5th 214, 230; see Code Civ. Proc., § 1094.5, subd. (b); *San Diego Navy Broadway Complex Coalition v. California Coastal Com.* (2019) 40 Cal.App.5th 563, 572 (*San Diego Navy Broadway*).)

B.    *The Commission Proceeded in the Manner Required by Law*

1.    *Applicable Law*

The Commission's process for reviewing a coastal development permit on appeal depends on whether the Commission has certified a land use plan where the local government has issued the permit.  Where the Commission has not certified a land use plan, "a coastal development permit shall be issued if . . . the commission on appeal[ ] finds that the proposed development is in conformity with Chapter 3" of the Coastal Act.  (§ 30604, subd. (a).)  Among other things, Chapter 3 requires new developments "to be visually compatible with the character of the surrounding areas . . . ."  (§ 30251.)

Where the Commission has certified a land use plan (but not a complete local program), "the authority for issuance of coastal development permits" is "delegated to the respective local governments" (§ 30600.5, subd. (b)), and the Commission must approve and issue the permit on appeal if the Commission "finds that the proposed development is in conformity with the certified land use plan" (§ 30600.5, subd. (c); see Cal. Code of Regs., tit. 14,

12

§ 13335). As relevant here, the Venice Land Use Plan requires that new developments "shall respect the scale and character of community development." (Venice Local Coastal Program Land Use Plan, Policy I.E.2.)

Although the Commission has certified a land use plan for Venice, Lighthouse and Rudisill and Hawk dispute whether the Commission's review of the permit is governed by section 30604, subdivision (a) (requiring the development to comply with Chapter 3 of the Coastal Act), or section 30600.5, subdivision (c) (requiring the development to comply with the land use plan).[4] Ultimately, we need not resolve this issue because the Commission determined the Project complied with both Chapter 3 of the Coastal Act and the Venice Land Use Plan, and

---

[4] Even after the Commission certifies a land use plan, the Commission does not delegate authority to local governments to issue coastal development permits "until the local government has provided copies of all the adopted procedures for the issuance of coastal development permits to the executive director of the commission." (§ 30600.5, subd. (e); see *Hagopian v. State of California* (2014) 223 Cal.App.4th 349, 364.) Lighthouse contends the City has not adopted and provided to the Commission the necessary procedures for the issuance of coastal development permits. Therefore, according to Lighthouse, section 30604, subdivision (a), applies when the Commission hears an appeal of a coastal development permit issued for a development in Venice, and the Commission only determines whether the development complies with Chapter 3 of the Coastal Act. Rudisill and Hawk argue that, regardless of whether the local government has complied with section 30600, subdivision (e), once the Commission has certified a land use plan the Commission may not issue a permit if the proposed development does not comply with the land use plan.

13

as we will discuss, the Commission did not abuse its discretion under either section.

The Commission reviews de novo a decision by a local government to issue a coastal development permit. (See Cal. Code Regs., tit. 14, §§ 13321 [review prior to certification of land use plan], 13336, 13337, subd. (b) [review after certification of land use plan].) Prior to the hearing, the Commission staff must prepare a written report recommending that the Commission "approve, conditionally approve, or deny the [permit], supported by specific findings with analysis of whether the proposed development conforms to the applicable standard of review . . . ." (*Id.*, tit. 14, § 13057, subd. (a)(3).)[5] "The commission shall vote" on the permit at the hearing (*id.*, tit. 14, § 13066, subd. (g)), and "[t]he commission's action is final upon the chairperson's announcement of the result" (*id.*, tit. 14, § 13094, subd. (c)).

> ## 2. *The Commission Complied with the Applicable Provisions of the Coastal Act and the California Code of Regulations*

The trial court ruled the Commission's decision to issue the permit was not based on its consideration whether the Project complied with the Coastal Act (or Venice Land Use Plan). The court ruled that the Commission instead decided it would be unfair to Lighthouse to deny the permit because the City had waited nearly three years to send the Commission notice of the

---

[5]     The same procedures apply at the hearing regardless of whether the Commission is reviewing a permit issued prior to or after certification of a land use plan. (See Cal. Code Regs., tit. 14, §§ 13321, 13337.)

14

permit and that the Commission's revised findings did not reflect the true reason for the Commission's decision.

Several of the commissioners who voted to approve the Project did comment at the hearing that the City failed to send timely notice of the permit and that Lighthouse should not be responsible for the City's mistake. But most of those commissioners also stated that the Project was consistent with what they would vote to approve anyway. The Commission argues that the revised report prepared after the hearing takes precedence over the commissioners' statements at the hearing and that the report accurately and adequately states the basis of the Commission's decision. Rudisill and Hawk argue that the commissioners' statements at the hearing take precedence and that the revised findings must accurately reflect the basis for the Commission's approval of the permit at the hearing.

The California Code of Regulations provides that, "[u]nless otherwise specified at the time of the vote," a Commission decision "consistent with the staff recommendation shall be deemed to have been taken on the basis of, and to have adopted, the reasons, findings and conclusions set forth in the staff report as modified by staff at the hearing." (Cal. Code Regs, tit. 14, § 13096, subd. (b).) But if "the commission action is substantially different than that recommended in the staff report, the prevailing commissioners shall state the basis for their action in sufficient detail to allow staff to prepare a revised staff report with proposed revised findings that reflect the action of the commission." (*Ibid.*) The Commission votes "on [the] proposed revised findings" at a subsequent public hearing, which "shall solely address whether the proposed revised findings reflect the action of the commission." (*Id.*, tit. 14, § 13096, subd. (c).)

15

We generally agree with Rudisill and Hawk that we cannot ignore the prevailing commissioners' comments at the hearing. Under California Code of Regulations, title 14, section 13096 the Commission cannot adopt revised findings if those findings do not accurately reflect the Commission's stated reasons for its decision. Moreover, ignoring the commissioners' statements would be inconsistent with California Code of Regulations, title 14, section 13094, which provides that the Commission's decision is final at the hearing after it votes to issue or deny a permit. (See *San Diego Navy Broadway*, *supra*, 40 Cal.App.5th at p. 577, fn. 8 ["revised findings" issued pursuant to the Coastal Act "are meant to capture actions, not change them"].) But section 13096 does not require the Commission, if it decides to act contrary to its staff recommendation, to describe in detail each of the findings supporting its decision at the hearing. Not only would that be impractical, it would render superfluous the provisions of section 13096 directing the staff to prepare, and the Commission to adopt, revised findings after the hearing.

The trial court recognized that some of the commissioners who voted to approve the Project indicated the Project was not significantly different from other homes in the neighborhood and other homes the Commission had approved, but the court ruled that these comments were not sufficient to allow staff to prepare a revised staff report reflecting the action of the Commission, as required by California Code of Regulations, title 14, section 13096. Under the circumstances, however, the prevailing commissioners' comments about the neighborhood and other projects the Commission had approved, though perhaps not as detailed and specific as they could have been, were sufficient to enable the staff to prepare revised findings.

16

The prevailing commissioners' comments followed detailed presentations by both the Commission's staff and Lighthouse representatives that analyzed the Project's compliance with the Coastal Act and Venice Land Use Plan. In addition to preparing the report, the Commission staff at the hearing presented a summary of its findings and recommendation. After the staff's presentation, Lighthouse argued that the Project complied with the Coastal Act and the land use plan. Lighthouse submitted information about, and renderings of, the Project and photographs of other residential structures in the neighborhood to show the Project's visual compatibility with the surrounding neighborhood. Lighthouse also presented information about the size of three other comparable three-story homes on the same block. Commissioner Diaz responded to these presentations that "everybody's analysis had some value that I was able to pull from everything everybody said." As discussed, Commissioner Diaz stated the Commission had approved very similar projects, Commissioner Luevano said the Project was not very different from other developments in the neighborhood, and Commissioner Bochco stated the Project (at least as modified by Lighthouse's proposed changes) had some design aspects the Commission would have requested.

"While a reviewing court must make certain an agency has adequately disclosed its reasoning process, . . . 'administrative findings need not be as precise or formal as would be required of a court [citation]. . . . [W]here reference to the administrative record informs the parties and reviewing courts of the theory upon which an agency has arrived at its ultimate finding and decision it has long been recognized that the decision should be upheld if the agency "in truth found those facts which as a matter

17

of law are essential to sustain its . . . [decision].""" (*Sierra Club v. California Coastal Com.* (1993) 19 Cal.App.4th 547, 556; accord, *San Diego Navy Broadway*, *supra*, 40 Cal.App.5th at p. 593.) Because the commissioners' comments about the Project's similarity to other residential structures in the neighborhood and other developments the Commission had approved followed the presentation by the staff and Lighthouse, it is a reasonable inference from the record of the hearing that the commissioners' comments took into account and were based on the detailed information the Commission staff and Lighthouse had just presented at the hearing. In addition, had the commissioners believed the revised findings did not reflect their views at the initial hearing on the Project, they could have voted not to approve them. And they didn't.

In fact, the changes from the original staff report to the revised staff report did largely reflect the prevailing commissioners' comments at the hearing. The original staff report and the revised report contained nearly identical facts about the neighborhood and Project, aside from the changes to the Project that Lighthouse proposed in response to the appeal. The primary difference was that the revised report reached different conclusions from those facts. For example, both the original report and the revised report stated that the majority of residential structures on the block were one-story, but that there were several other three-story structures on the block and near the Project. The revised report added that the Project was "not drastically different than some of the other structures in the neighborhood" and that the articulation and third-story setback, along with Lighthouse's proposed modifications to the façade, balcony, and landscaping, made the Project align more closely

18

with other structures in the neighborhood.  These additions were conclusions consistent with the prevailing commissioners' comments, not new facts supporting the Commission's decision. (Cf. *Ocean Harbor House Homeowners Assn. v. California Coastal Com.* (2008) 163 Cal.App.4th 215, 245 [the Commission did not abuse its discretion where the staff report recommended one of three methods presented for calculating a mitigation fee as a condition for issuing a permit, the Commission voted to adopt one of the other methods, and the Commission's revised report stated the adopted method was the most accurate].)

The trial court ruled, and Rudisill and Hawk argue, the Commission's revised findings were a post hoc rationalization because three of the prevailing commissioners commented that the City was at fault for failing to send timely notice of the permit and that it would be unfair to Lighthouse to deny the permit.  (See *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 425 ["[w]e will not accept *post hoc* rationalizations for actions already taken"].)  The record suggests these considerations may have motivated these commissioners.  Nevertheless, an "'agency's action comes before the court with a presumption of correctness and regularity.'" (*Credit Ins. General Agents Assn. v. Payne* (1976) 16 Cal.3d 651, 657; see *County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 607, fn. 24 [courts "presume that governmental agencies will obey and follow the law"].)  Three of the commissioners who commented on the City's delay also discussed the Project's compatibility with the neighborhood and other approved projects.  The other commissioners who voted to approve the Project (other than Commissioner McClure) did not disclose the reasons for their votes.  We assume the Commission

19

decided to approve the permit after applying the correct standard, even if other factors partially motivated the decision. (See *Pacific Water Conditioning Assn., Inc. v. City Council* (1977) 73 Cal.App.3d 546, 554 [courts generally "do not inquire into the . . . mental processes by which an administrative agency and its members arrived at their decision"]; *Board of Administration, Public Employees' Retirement System v. Superior Court* (1975) 50 Cal.App.3d 314, 319 [same].)

Had the prevailing commissioners at the hearing discussed only the City's delay in sending notice of the permit, the result might be different. But under the circumstances, the record shows the commissioners complied with their obligations under the Coastal Act and the California Code of Regulations.

C.    *Substantial Evidence Supported the Commission's Determination the Project Would Not Violate the Coastal Act or the Venice Land Use Plan*

Although the trial court declined to decide whether substantial evidence supported the Commission's determination the Project complied with both Chapter 3 of the Coastal Act and the Venice Land Use Plan, the Commission and Lighthouse ask us to hold substantial evidence supported the Commission's determination. Rudisill and Hawk ask us to remand the matter and direct the trial court to rule on the issue. In the alternative, they argue in their cross-appeal that substantial evidence did not support the Commission's decision.

On review of a Commission's decision, "'[o]ur scope of review is identical to that of the trial court. [Citations.] We, like the trial court, examine all relevant materials in the entire administrative record to determine whether the agency's decision

20

is supported by substantial evidence.'" (*San Diego Navy Broadway*, *supra*, 40 Cal.App.5th at p. 572; see *Ross v. California Coastal Com.* (2011) 199 Cal.App.4th 900, 922.) Because we, like the trial court, review whether substantial evidence supported the Commission's determination, and because the parties have fully briefed the issue, we will decide it.

Judicial review of a Commission decision "'"involves some weighing to fairly estimate the worth of the evidence, [but] that limited weighing does not constitute independent review . . . . Rather, it is for the [Commission] to weigh the preponderance of conflicting evidence, as [we] may reverse its decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it."'" (*San Diego Navy Broadway*, *supra*, 40 Cal.App.5th at p. 572; see *McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 921.) "'The [Commission's] findings and actions are presumed to be supported by substantial evidence,' and plaintiffs have the burden of demonstrating otherwise." (*Mountainlands Conservancy, LLC v. California Coastal Com.*, *supra*, 47 Cal.App.5th at p. 230; see *Ross v. California Coastal Com.*, *supra*, 199 Cal.App.4th at p. 921.)

Rudisill and Hawk contend substantial evidence did not support the Commission's findings that the Project was visually compatible with the character of the neighborhood and compatible with the mass and scale of the neighborhood. (See § 30251; Venice Local Coastal Program Land Use Plan, Policy I.E.2.)[6] But substantial evidence did support those

---

[6] Although Rudisill and Hawk assert substantial evidence did not support the Commission's finding that the Project

21

findings. According to both the original and revised staff reports, the majority of homes in the Oakwood neighborhood are one story, but there are also "several two-story and three-story structures" in the neighborhood. On the same block as the Project, there are two 30-foot, three-story homes where the developer constructed the homes on a single lot, as well as "two other projects featuring three-story homes" where the developer constructed multiple homes on one lot. There are also two two-story homes built on a single lot on the next block. The report also acknowledged there are several two-story, multi-unit residences in the neighborhood.

The evidence Lighthouse submitted in response to the appeal showed three similar, side-by-side, three-story homes on the same block as the Project.[7] Two of these three-story homes had similar floor areas to the proposed homes of the Project, and like the homes in the Project, the floor area to lot ratio of these residences was approximately one to one. Lighthouse also submitted pictures showing other two- and-three story residential structures on the streets adjacent to the Project.

As the Commission stated in its revised findings, the Project had some characteristics that were unique in the neighborhood. For example, the Commission had not approved

---

complied with other sections of the Coastal Act and provisions of the Land Use Plan, they do not raise arguments specific to any other statutes or provisions.

[7] According to the staff report, the developer built one of these three homes on a subdivided lot, and a second home is located behind the house on the other lot subdivision. It is not clear whether the other two homes were built on individual lots or subdivided lots.

any other project in the Oakwood neighborhood where the developer sought to build four homes on two lots. And there were no other homes on the block with zero-foot setbacks between the homes. But this does not mean no reasonable commissioner could have concluded that, notwithstanding these characteristics, the Project was compatible with the neighborhood's character, mass, and scale. Ultimately, it was the Commission's responsibility to weigh the various characteristics of the Project against the characteristics of the neighborhood and determine whether they were compatible—the type of determination an agency is best equipped to make. (See *Naraghi Lakes Neighborhood Preservation Assn. v. City of Modesto* (2016) 1 Cal.App.5th 9, 18 ["judicial review of consistency findings is highly deferential to the local agency"]; *Reddell v. California Coastal Com.* (2009) 180 Cal.App.4th 956, 970 ["A decision on the compatibility of the project with the surrounding area is a subjective decision."]; *Dore v. County of Ventura* (1994) 23 Cal.App.4th 320, 326-327 ["Because the administrative agency has technical expertise to aid it in arriving at its decision, we should not interfere with the discretionary judgments made by the agency."].) In light of the fact that there were other two-story and three-story homes in the neighborhood, including three three-story homes on the same block as the Project, substantial evidence supported the Commission's findings that the Project was "not drastically different from other projects . . . in the same neighborhood" and that the front setbacks and articulation of the

23

homes, and Lighthouse's proposed changes, rendered the Project compatible with the neighborhood.[8]

Rudisill and Hawk argue Lighthouse did not propose changes that would affect the mass or scale of the Project; it only proposed "cosmetic" changes to the balcony, façade, and landscaping that did "not constitute evidence" supporting the Commission's findings. Therefore, according to Rudisill and Hawk, the Commission had no basis for rejecting its staff's original determination the Project was not compatible with the mass and scale of the neighborhood. Rudisill and Hawk's argument, however, is based on several false premises. First, the Commission did not approve the Project, as Rudisill and Hawk assert, solely "because the developer offered to reduce the height of a balcony wall, change paint colors and the shape of the front door glass, and plant a tree." The Commission approved the Project for all the reasons discussed by the Commissioners and documented in the revised report. For example, the Commission did not agree with its staff's initial determination that the mass and scale of the Project necessarily rendered the Project incompatible with the neighborhood. The Commission found that, although the Project was large and had some unique

---

[8] Rudisill and Hawk argue no reasonable person would have concluded that a three-story structure was compatible with the mass and scale of the neighborhood where only 10 percent of the homes on the block were three stories. This interpretation of the Venice Land Use Plan is too restrictive. The plan does not state all new developments must be smaller (or larger) than a defined percentage of other structures in the neighborhood. A reasonable person could conclude a structure is compatible with the mass and scale of a neighborhood, even if it is on the larger end of the scale compared to other structures.

24

characteristics, it included articulation, e.g., both the front setbacks between the second and third stories of the homes and the front setbacks between the outer homes and interior homes—a change from the original plan Lighthouse had already implemented.  The Commission also found Lighthouse's additional proposed changes—which were not just applying a coat of paint and planting a tree, but included having "less massing along the front balconies" and modifying the "middle units to include additional glass and remove diamond shape"—further rendered the Project compatible with the neighborhood.

Second, and more important, the staff's initial findings and recommendation are not binding; the Commission has the authority to reject them.  The Commission only adopts the findings in the staff report if it votes to take an action "consistent with the staff recommendation" and does not otherwise specify any disagreements with the findings.  (Cal. Code Regs., tit. 14, § 13096, subd. (b).)  That did not occur here.  The Commission was free to disagree with its staff's analysis and find the Project's mass and scale were consistent with the neighborhood in light of the evidence.  That was the Commission's job.

## DISPOSITION

The judgment is reversed.  The trial court is directed to vacate its order granting the petition for writ of mandate and enter a new order denying it.  The Commission and Lighthouse are to recover their costs on appeal.


SEGAL, Acting P. J.


We concur:



FEUER, J.



RICHARDSON, J.*

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.